08 C 1344

**JUDGE CASTILLO**
**MAGISTRATE JUDGE ASHMAN**

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

In re Application of Holland Middle East  )
Trading Ltd.                              )
to Obtain Discovery For Use in a          )
Suit Pending in the                       )
Haarlem District Court of the             )
Kingdom of the Netherlands                )
                                          )

## DECLARATION OF MARIELLE KOPPENOL-LAFORCE

I, Marielle Koppenol-Laforce, hereby declare as follows:

1.      I am an attorney licensed to practice law in the Netherlands, and have been practicing commercial law for over seven years, as well as teaching and researching conflict of law topics for 23 years. I am a partner in the Dutch law firm of Houthoff Buruma N.V. in Rotterdam. I am the author of *International Contracts*, a 1996 textbook on aspects of international procedure, arbitration, sales and carriage relating to international contracts, as well as many other legal publications in English and Dutch.

2.      I am the attorney for the claimants in an action pending before the Haarlem District Court in the Netherlands titled *Holland Middle East Trading Ltd. et al. v. Power Plate International B.V., et al.* (case number 136287 HAZA 07-778).

3.      *Holland Middle East Trading Ltd. et al. v. Power Plate International B.V., et al.* was commenced in 2006 by Holland Middle East Trading Ltd., Franciscus Giezen, Petronella Van Aspert and Power Plate Trading LLC against Power Plate International B.V., Mark Minter, Allan Fisher, Lee Hillman and Augustinus Van Der Meer.

4.      The Dutch action challenges Power Plate's unlawful termination of the Holland Middle East Trading Ltd.'s license to distribute the "Power Plate" vibration fitness machine in countries across the Middle East. In the initial summary proceedings, the Haarlem

district court judge made a preliminary finding that Power Plate International's termination of the agreement was wrongful and ignored all contractual rules simply because Power Plate wanted to end Holland Middle East Trading Ltd.'s distributorship at all costs. Order of the Haarlem District Court, January 17, 2007, at § 4.38, attached as Exhibit 1). The court also ordered Power Plate to pay a € 900,000 advance on damages to the plaintiffs. *Id.* at § 6.

5.      Power Plate appealed this decision. The appellate court affirmed every aspect of the district court's decision, and also ordered Power Plate to pay the plaintiffs' costs incurred from the appeal. Opinion of the Court of Appeal in Amsterdam, August 9, 2007, at 12 (attached as Exhibit 2).

6.      Power Plate did not abide by the judgment and took a variety of actions to evade collection. The district court summary judge ordered that, because "Minter, Fisher, Hulman [Hillman] and Van der Meer…have actively and intentionally caused virtually every attempt of HMET to collect its claim on PPI BV to fail and in doing so have willfully frustrated the execution of the judgment of 17 January 2007," those directors shall be jointly and severally liable to Holland Middle East Trading for € 1,100,000 including costs. Judgment in Summary Proceeding of the Haarlem District Court, July 6, 2007, at 8, attached as Exhibit 3.

7.      The case is currently proceeding on the merits to determine the claimants' right to € 22,000,000 in damages. Power Plate ultimately satisfied the € 1,100,000 advance on the judgment.

8.      The requested documents are central to the prosecution of the case pending in the Netherlands. Holland Middle East Trading seeks documents that shed light on the true reasons that its distributorship agreements were terminated. These documents will also give information on the amount of damages owed to Holland Middle East Trading. Finally, evidence

gathered by way of this application may show that the directors of Power Plate have illicitly

shifted its assets to a different corporate entity, leaving nothing but a shell corporation from

which Holland Middle East Trading cannot collect.

      9.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the

laws of the United States of America that the foregoing is true and correct.

Dated: March 5, 2008

By: _____
              Marielle Koppenol-Laforce

              Houthoff Buruma B.V.
              3000 BM Rotterdam
              Weena 355
              Rotterdam, The Netherlands
              +31 (0)10 2172525
              m.koppenol@houthoff.com

# EXHIBIT 1



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

IN THE NAME OF THE QUEEN

# judgment

**HAARLEM DISTRICT COURT**
Civil-law Section

Case / cause list number: 130278 / KG ZA 06-579 and 130023 / KG ZA 06-568

**Judgment in summary proceedings, dated 17 January 2007**

in the case of

**1. HOLLAND MIDDLE EAST TRADING LTD.,**
a legal entity organised and existing under the laws of the British Virgin Islands, established
in Dubai, United Arab Emirates,
**2. FRANCISCUS ANTONIUS MARIA GIEZEN,**
residing in Dubai, United Arab Emirates,
**3 PETRONELLA JOHANNA ELIZABETH VAN ASPERT,**
residing in Dubai, United Arab Emirates,
**4. POWER PLATE TRADING LLC,**
a legal entity organised and existing under the laws of the United Arab Emirates, established
in Dubai, United Arab Emirates,
claimants in the main action,
defendants in the motion,
counsel: M E Koppenol-Laforce and J Meuleman in Amsterdam,
local counsel: M. Middeldorp,

versus

**POWER PLATE INTERNATIONAL B V,**
A private company with limited liability
having its registered office in Amstelveen and its place of business in Badhoevedorp,
defendant in the main action,
claimant in the motion,
counsel: A. J Fioole and E A.V van Dam in Amsterdam
local counsel: H.K. Garvelink

Hereinafter claimants will be referred to as: "HMET", "Giezen", "Van Aspert" and "Power
Plate Trading".
Together they will be referred to as: "HMET et al." Defendant will hereinafter be referred to
as: "PPI".



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

## 1. The proceedings

1 1      By judgment in summary proceedings dated 21 December 2006, the
*voorzieningenrechter* (Judge hearing applications for provisional relief) decided on the claim
as represented in that judgment in 3 1(II). With respect to the claims represented below in
3.1 as well as with respect to the motion for providing security a decision will be taken in the
present judgment, in accordance with what is decided in the said judgment under 1 2

1.2 The course of the proceedings (insofar as it pertains to the points in dispute that are as yet
unresolved) appears from:
-       the summons of 7 December 2006;
-       the exhibits submitted on the part of HMEI et al. by letter dated 14 December 2006
        (numbered 1 to 14, inclusive);
-       the document containing a motion for providing security on the part of PPI,
        transmitted by fax on 14 December 2006;
-       the exhibit submitted on the part of HMEI et al. by letter dated 18 December 2006
        (numbered 15 to 18, inclusive);
-       the exhibits submitted on the part of HMEI et al  by letter dated 18 December 2006
        (numbered 19 to 21, inclusive);
-       a letter sent by fax on the part of PPI dated 18 December 2006, with enclosure;
-       a letter sent by fax on the part of PPI dated 19 December 2006, with enclosures;
-       the pleading notes of counsels Koppenol-Laforce and Meuleman;
-       the pleading notes of counsels Fioole and Van Dam;
-       the exhibits submitted at the hearing on the part of PPI (numbered 1 to 20,
        inclusive);
-       a letter on the part of HMEI et al. dated 28 December 2006;
-       a letter sent by fax on the part of PPI dated 29 December 2006;
-       a letter sent by fax on the part of HMEI et al  dated 2 January 2006, with enclosure;
-       a letter sent by fax on the part of PPI dated 3 January 2007;
-       a letter sent by fax on the part of PPI dated 5 January 2007, with exhibits (numbered
        21 to 23, inclusive);
-       a letter sent by fax on the part of PPI dated 5 January 2007, with enclosure;
-       a letter sent by fax on the part of HMEI et al  dated 5 January 2007

1.3      On the occasion of the oral hearing, held on 19 December 2006, the
*voorzieningenrechter* agreed with the parties that due to the late submission of exhibits by
PPI, HMEI et al  would be given the opportunity to respond in writing to PPI's exhibits and
that subsequently PPI would be given the opportunity to respond to the response of HMEI et
al. Thereupon, the parties submitted their respective responses, by (fax) letter of 28
December 2006 and 5 January 2007, respectively. By the latter-mentioned letter sent by fax
3 new exhibits were submitted on the part of PPI (numbered 21 to 23, inclusive). By letter
sent by fax dated 5 January 2007 HMEI et al  asked the *voorzieningenrechter* not to take
PPI's letter and the exhibits thereto into consideration. The *voorzieningenrechter* granted this
request, with the understanding that exhibits 21 to 23, inclusive, will not be considered and
that he has not taken into consideration the statements in PPI's response in the said letter of 5
January 2007, insofar as these contain more than a response to the statements made on the
part of HMEI et al. as included in their letter of 28 December 2006.



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

1.4    Judgment was set to be pronounced on 17 January 2007.

**2. The facts**

2.1    Giezen is director of HMET. Van Aspert is the sole shareholder of HMET. In addition, Van Aspert is the sole shareholder and director of Power Plate Trading.

2.2    Until the beginning of 2006 PPI was the company of Guus van der Meer. It owns the rights to the name and to the intellectual property rights to the Power Plate, a piece of fitness equipment that can be used to exercise muscles and to lose weight.

2.3    PPI has concluded distribution (licensee) agreements with a large number of distributors all over the world, which provide for the distribution of the Power Plate by these distributors in the territories that are allocated to them.

2.4    PPI ("Licensor") and HMET ("Licensee") have concluded a "Licensee Agreement" dated 20 September 2004. This agreement provides, *inter alia*:
(..)
*A      The Licensor has developed a product known as Power Plate® for Body Vibration® training, being Power Plate Personal and Power Plate Next Generation (hereinafter called "the PPP and PP NG")*
*(..)*
*D      The Licensee wishes to obtain the exclusive rights to sell the Product in Egypt, Bahrain, Yemen, Jordanian, Iran, Oman, Qatar, Kuwait, Lebanon, UEA and Syria, and the Licensor agrees to grant the licence to distribute and sell on and subject to the terms of this agreement*

*WHEREBY IT IS MUTUALLY AGREED AS FOLLOWS*

*la 1 a   The Licensor hereby grants the Licensee the exclusive rights to distribute, market and sell the Product using the trademarks in the Territory, and the Licensee agrees to act as the sole distributor to the Licensor under the terms of this agreement*
*The Licensor nor the Licensee shall authorise any third party, person, firm or company, to use the trademarks or sell or market the products within the Territory during the term of this Agreement*

*lb     The license hereby granted shall continue for a period of 12 months commencing on 1st October 2004 ("the Initial Term'? and shall on expiry of 12 months automatically terminate unless the provisions f clause IC below apply*

*lc     If during the Initial Term the Licensee shall have purchased not less than 75 PP NG's and 75 PPP Products from the Licensor and paid the price set out in the Schedule for each of these Products, then the Licensee shall have the exclusive right to renew this Agreement for another 12 months period at the end of the Initial Term ("The Second Term'). The Licensee shall notify the Licensor not less than 20 working days before the expiry of the Initial Term of its desire to renew the Agreement in accordance with this provision)*



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

1d      If during the "Second Term" the Licensee shall have purchased not less than 125 PP
NG and 125 PPP Products from the Licensor and paid the price set out in the Schedule for
each of these Products then the Licensee shall have the exclusive right to renew this
Agreement for another 12 months period ("Third term") at the end of the Second Term

If during the "Third Term" the Licensee purchases not less than 200 PPNG and 200PPP
Products from the Licensor and paid the price set out in the Schedule for each of these
Products, then the license will be renewed automatically for another 12 months, unless
terminated by either party with the express condition of giving to the other not less than 20
working days notice of its intention to terminate this agreement before the expiry of any
Term

1e      If the licence is not renewed at any time, the right to distribute and sell the Product
in volume will automatically revert to the Licensor, after which the Licensee is no longer
allowed to sell or market the Product, or make use of the trademark

1f      The license and rights to distribute the Product created by the terms of this
agreement may not be assigned or otherwise transferred to any party by the Licensee,
without the prior written consent of the Licensor
(...)
3b      The Licensee can alter the product -including minor details -only with the prior
written permission of the Licensor on beforehand
( )
8 a      The product may not be resold in any form or condition than the form or condition in
which the Product was originally supplied to Licensee by Licensor
b      Licensee is not allowed to enter into any agreement with any third party for the
distribution in the Territory of products similar to or competitive with the Product
( )
9      Termination
1      If either party fails to comply with any of the terms of this Agreement, or fails within
one month of being requested to do so, to remedy a breach capable of being remedied, the
other party may terminate this Agreement by summary notice in writing
( )

2.5    At the end of 2004 Giezen and Van Aspert departed for Dubai with their three
children to take up the activities as distributor of the Power Plate there, in accordance with
the above-mentioned agreement

2.6    In an email dated 10 March 2005 Ch. de Groot (assistant operations manager at PPI)
informed Giezen and Van Aspert as follows:
(...) I had a look at the finances, which unfortunately must be done as well, and regret to say
that I found that not all invoices have been paid yet  These invoices date back to long ago,
and include those for the contribution towards the marketing costs and for the final delivery
of PP Ng from DECEMBER 2005



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

*Enclosed I send you copies of the relevant invoice.*
*The total amount is Euro 7,250 on the invoices that were made in the name of Expeditors at the time ( . ); the other is for Euro 9,237.50 for the 5 NG.*

*You will understand that both invoices have to paid immediately.*

2.7    In an email dated 29 March 2006, Giezen wrote to Ch. de Groot:
*( . ) Could you look into the possibility to delete the Chinese characters when replacing the rubbers? I use a spray can with red paint for the purpose. As I already told you before, the people here are not in favour of Chinatown products, no matter how good they are. Furthermore, we require a certificate of origin for a number of countries, which is, of course, the Netherlands. And people around here know that we still do not write in Chinese script in the Netherlands ( . )*

2.8    In an e-mail from T van Deijssel, of PPI, to HMEI dated 31 May 2005 the following is stated:
*( . ) I herewith wish to briefly mention the matters we discussed and which I will communicate to the organisation.*
*( . )*
*Power Plate ME works with sub-distributors, with whom agreements are made ( . )*

2.9    In addition, PPI and HMEI concluded a "Licensee Agreement" dated 1 June 2005. In this agreement, which is virtually identical to the agreement of 20 September 2004, the following is stipulated in derogation from the earlier agreement:
*(...)*
*D    The Licensee wishes to obtain the exclusive rights to sell the Product in Saudi Arabia, (the Territory) and the Licensor agrees to grant the license to distribute and sell on and subject to the terms of this agreement*
*( . )*
*1b    The license hereby granted shall continue for a period of 12 months commencing on 1st June 2005 ("the Initial Term") and shall on expiry of 12 months automatically terminate unless the provisions of clause 1C below apply*

*1c    If during the Initial Term the Licensee shall have purchased not less than 20 PP NG's Products and 5 PP Personal Products from the Licensor and paid the price set out in the Schedule for each of these Products, then the Licensee shall have the exclusive right to renew this Agreement for another 9 months period at the end of the Initial Term ("The Second Term"). The Licensee shall notify the Licensor not less than 20 working days before the expiry of the Initial Term of its desire to renew the Agreement in accordance with this provision*

*1d    If during the "Second Term" the Licensee shall have purchased not less than 65 PPNG and 40 PP Personal Products from the Licensor and paid the price set out in the Schedule for each of these Products then the Licensee shall have the exclusive right to renew this Agreement for another 9 months period ("Third term") at the end of the Second Term*



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

---

*If during the "Third Term" the Licensee purchases not less than 150 PPNG and 75 PP Personal Products from the Licensor and paid the price set out in the Schedule for each of these Products then the license will be renewed automatically, unless terminated by either party with the express condition of giving to the other not less than 20 working days notice of its intention to terminate this agreement before the expiry of any Term (...)*

Hereinafter, the licensee agreements of 20 September 2004 and 1 June 2005 will also be referred to as: the "Agreement of 20 September 2004" and the "Agreement of 1 June 2005", respectively. They will jointly also be referred to as: the "Agreements".

2.10    In an email from M van der Meer (PPI) to Giezen and Van Aspert dated 28 July 2005 it is stated:

*(...) Can you please give me list of all countries that have to be included in the country option of ME com? (...)*

By email of 28 July 2005, Van Aspert responded to this email from M van der Meer as follows:

*(...) Please include the following countries, in alphabetical order:*

*Bahrain, Egypt, Islamic Republic of Iran, Iraq, Jordan Kingdom of Saudi Arabia, Kuwait, Lebanon, Oman, Palestine, Pakistan, Qatar, Syria, United Arab Emirates, Yemen*

*Other countries like Libya, Sudan, Somalia or whatever*
*India and surroundings (Bangladesh, Brunei, Nepal, Sri Lanka etc.), Pakistan, (Afghanistan) should also be stated under South Asian Countries*

*The above-mentioned countries are all Islamic countries and have to be described as above (...)*

By email dated 29 July 2005 M van der Meer wrote to Van Aspert:
*(...) Thanks for the list. If you agree with the offer, please send me a confirmation of this email and of the attachment so that I can give the Website builder the go-ahead (...)*

2.11    In the beginning of 2006 Guus van der Meer sold his shares in PPI to an American hedge fund, which resulted in changes in the composition of the board and to the appointment of other directors, including M Minter as president.

2.12    In an email from this Minter to E Gannage, a former sub-distributor of HMEI in the Lebanon, dated 19 April 2006, it is stated:
*(...) PPME is licensed to distribute our product in several ME territories, including the Lebanon, and is subject to blanket volume requirements for the combined territories in order to maintain the license To effect distribution they are free to the extent they are able to establish their own infrastructure and presence in any of these territories to appoint agents*



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

*or, as they have done, to sub-licence these rights as they have to you. We have neither desire, nor grounds, at this point, for termination of their license (…)*

2.13 By email dated 19 June 2006 M Minter wrote to Giezen:
*(…) As for the contract, as mentioned when we met, due to the restructuring, the PPI BV company in the Netherlands will be liquidated within the next few weeks to make way for our new corporate structure The new Dutch entity will not own the IP and will not be legally allowed to sell product outside NL In order to comply with our insurance and tax requirements we cannot sell products for resale without there being a contract between the parties (…)*

*We are delighted at your continually improving sales We do not want any interruptions. Therefore I would urge you to contact me to discuss anything you wish about the new contract, but there WILL be a point soon, when we cannot supply product other than under the terms of this new agreement (…)*

2.14    M Minter informed Giezen in an email dated 15 July 2006:
*(…) Reason for our request derives from our being in the process of liquidating PPI BV. We own 100% of this company and Arun and I have total control of the bank accounts It would simpli5 our inter-company accounting somewhat if you could make this payment, provide the supporting documentation, and get our immediate refund*

*Would ask you, in the spirit of our co-operation, to reconsider your position (…)*

2.15    On 9 September 2006 M Minter informed Giezen as follows:
*(…) As mentioned, we will seek advice of UAE counsel as to the enforceability of the contract drafted by us Where necessary we will make any modifications to preserve its original intent*

*Meanwhile we will direct all correspondence to our lawyer who will correspond only with your legal representative. Our lawyer is in a position to fully explain to yours the logic and intent of our drafting*

*There will be a point when you will need to consider the merits of doing business with us on terms which we consider to be reasonable or not ()*

2.16    A subsequent email from Giezen to Minter dated 10 September 2006 stated:

*(…) However I'm considerable shocked about the content of it Of course I understand that our lawyers need to work on an acceptable agreement but it needs to be mutual acceptable By mentioning that we have to consider doing business with you (PPI) based only on terms you (PPI) consider as reasonable can't be the case*

*You (PPI) have purposed a new contract which doesn't mean that we have to agree and to accept al less secure contract as the present contract which is a value contract which will remain until we have agreed to the new contract and this is signed We are entitled to defence*



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

our company for again a secure contract for now and in the future since Power- Plate Middle East is a company own by us ( )

2.17    In an email from Giezen to Minter dated 30 September 2006 it is laid down:
( ) Even keep in mind that someone can easily start tomorrow a machine called Power- Plate Newest Generation in the Middle East and start selling it based on what we have created ( )

2.18    By letter dated 19 October 2006 PPI terminated the Agreements with HMET. It is stated in these letters:
( ) On behalf of our client we herewith terminate said agreement pursuant to article (1) thereof by summary notice with immediate effect, because of various breaches of the agreement by your enterprise which are incapable of being remedied

The breaches include but are not limited to sublicensing in violation of article 1(a), modification of the product in violation of articles 3(b) and 8(a), threatening to build your own vibration machine in violation of article 8(b) Furthermore, you have acted contrary to your duties as a good distributor ( )

2.19    In a written statement from M Minter (PPI) dated 18 December 2006 it is stated:
( ) *Improper sub-licensees* ( ) I explicitly point out that we have never consented to the appointment of third parties on the basis that these third parties would carry out activities at their own expense and risk ( )We knew that HMET served the market in those countries through representatives (agents, sub-distributors, dealers, sub-licensees or whatever these representatives should be legally characterized), be it that those representatives should at all times conduct the Power Plate business in the respective countries at the expense and risk of our contracting party HMET. That the Power Plate business had to be conducted at the expense and risk of HMET was something both PPI and HMEI were fully aware of ( )

*HMET's product tampering, defacement and misrepresentation of product country of origin* ( ) I understand that this conduct was part of a scheme by HMET to defraud its customers into believing that the products were manufactured in Europe rather than in China, thereby exposing PPI to direct liability from the defrauded customers, as well as from HMET's representatives,

*HMET's misrepresentation of its sales territory* ( ) As a result, PPI is now exposed to substantial liability for these misrepresentations ( )

*HMET's threat to manufacture and sell competing products* ( ) Mr Giezen and Ms Van Aspert threatened to manufacture vibration equipment themselves in order to compete again PPI The explicit threat to manufacture occurred in a telephone conversation of October 10, 2006 where I was advising them that they were not free to negotiate sales to global customers ( ) In response they stated that they had the ability to create similar products themselves, and that they would do so and then sell such products to these unapproved global customers if I did not agree to let them sell the PPI products ( )



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

### 3.    The dispute

3 1    HMET et al  claim - stated briefly - that the *voorzieningenrechter*, by judgment
having immediate effect:

I        orders PPI, by way of provisional relief, to pay €4,000,000 as an advance payment
         for compensation of the loss HMET et al. have suffered and will still suffer, or such
         sum as the *voorzieningenrechter* shall decide in all fairness;

II       (. .)

III      orders PPI to pay the costs of these proceedings

3 2    HMET et al. base their claim - stated briefly - on the ground that PPI, as will be
further set forth below, had no valid reason to summarily terminate the Agreements on 19
October 2006. The Agreements are terminated wrongly and HMET et al. suffer considerable
loss as a result of that termination

### 4.    The Assessment

4.1    PPI based its termination of the Agreements on the following grounds:

-       HMET granted sub-licenses in violation of articles 1(a) and 1(f) of the Agreements;
-       HMET has made modifications to the Power Plates in violation of articles 3(b) and
        8(a) of the Agreements;
-       HMET has threatened to build a competing machine, in violation of article 8(b) of
        the Agreements;
-       HMET has acted in violation of its obligations as a good distributor

4 2    Below, each of the above-mentioned grounds will be discussed separately

*Granting sub-licenses by HMET to third parties*

4 3    PPI contends that HMET was not allowed, pursuant to articles 1 (a) and 1 (f) of the
Agreements, to assign the rights to sell the Power Plates it was awarded to third parties
without the prior written permission of PPI

4.4    HMET et al  responded to this by stating that an email from T van Deijssel, of PPI,
to HMET dated 31May 2005 (see above, under 2 8) and an email from M Minter,
President of PPI, to E Gannage, former sub-distributor of HMET in the Lebanon, dated 19
April 2006 (see above under 2.12), show that PPI had been aware that HMET had appointed
agents and sub-distributors in its territory for the sale of Power Plates for quite some time
and that PPI allowed this

4.5    PPI responded to this by stating that the statement of HMET et al. that PPI
supposedly had given it permission to appoint sub-distributors is incorrect. The said emails
misrepresent the events, since they have been taken entirely from their context
In addition PPI argued that it never gave permission to appoint sub-distributors with the
understanding that these third parties would sell the Power Plates for their own account and



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

risk. The only way in which PPI is able to control the resale of the Power Plates in its
distribution network is by having the local activities conducted for the account and risk of its
contract parties. If HMET (or one of its agents) infringe the intellectual property rights of
PPI, PPI should be able to hold HMET directly liable. The same holds true, or so PPI
contends, for (inter alia) guarantees and complaints, insofar as they fall within the
distributor's scope of risk. PPI referred in this regard to the statement of M Minter dated 18
December 2006 it submitted.

4.6 De *voorzieningem echter* considers first of all that PPI cannot limit itself to a refutation
as set forth in 4.5. PPI was to have given the proper context (in its view) by way of
submitting the correspondence and/or meeting reports that constitute the context of the
disputed emails.
The *voorzieningem echter* considers it likely that PPI did not only allow that sub-distributors,
were appointed, but that this even took place with its consent. This is even more plausible
because by doing so the scope of action of HMET - and consequently the possibility for
setting up a network, which was also for the benefit of PPI, and for generating sales - was
expanded.
Nor is the appointment of sub-distributors incompatible with the principal's wish to be able
to hold the distributor to account and liable with respect to the mentioned issues. Such issues
are commonly contractually agreed between the parties in a distribution network.
Finally, no evidence has been submitted that the sub-distribution agreements used by HMET
have resulted in any problems that have been or may be imputed to HMET.
This means that the first ground for termination is invalid.

*Unauthorised modifications by HMET to the Power Plates*

4 7    PPI contends that HMET modified the Power Plates without being authorised to do
so by removing Chinese characters on the Power Plates without its permission and by doing
so acted in violation of articles 3(b) and 8(a) of the Agreements. PPI believes that this alone
already constitutes sufficient grounds to be allowed to summarily terminate the Agreements.

4.8    HMET et al. contend that HMET made the said modifications in March/April 2005
with the consent, or in any event with the knowledge, of PPI, to some ten Power Plates and
that as from July 2005 the Power Plates no longer contained any Chinese characters. HMET
et al. also pointed out the fact that the "Certificate of Origin" they have submitted, stated:
*"We, Power-Plate International herewith confirm that the goods shipped on the "CMA CGM
Othello" with Bill of loading number "1RT013946" originate from The Netherlands"*

4 9    PPI contests that spraying out the Chinese characters on the Power Plates only took
place in March/April 2005; it submitted in this connection that the Power Plate was produced
in China for the entire duration of the Agreements. According to PPI, the Certificate of
Origin only pertains to the country from where the goods were shipped and has no bearing
on the country in which the Power Plates were (and are) produced, i e. China. Furthermore,
PPI contests that the spraying over only happened occasionally.



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

4.10    The *voorzieningenrechter* considers that HMET et al. have made a sufficiently
plausible case that the modifications to the Power Plates were made with the (tacit) consent
and knowledge of Ch. De Groot, assistant operations manager at PPI. The
*voorzieningenrechter* refers in this connection to an email from Giezen to De Groot dated 29
March 2005 (see above, under 2.7). Since De Groot was one of HMET's permanent contacts
at PPI, said knowledge of De Groot must also be attributed to PPI. This is not altered by
PPI's contention that Van der Meer (director of PPI) did not consent to the request HMET
made to him to have the Chinese markings removed, since this request was made before the
said email of 29 March 2005 was sent.

4.11    Furthermore, it is not considered likely that PPI tried to market the products as being
made in China. The *voorzieningenrechter* deems it likely that generally speaking the idea
exists that products made in Western Europe are more highly valued in the Middle East than
products made in China. PPI has failed to make a plausible case that it is of a different
opinion in this regard. Nor has PPI further substantiated that is has an interest in having
China stated as country of production.

4.12    Finally, PPI failed to make a plausible case that the said modifications were made
more than just occasionally. The email from Giezen to M. Minter, submitted on the part of
PPI as exhibit 9, in which Giezen writes "*We used paint spray to take this away allways*"
insufficiently substantiates this, since the number of times such modifications were made is
not further specified.

4.13    But even if the above were otherwise, the "modifications" could still not be used as
ground for termination, in a situation in which there is no evidence that PPI has demanded
beforehand that the spraying over be ceased henceforth.

4.14    PPI's contention, as laid down in the statement of M. Minter dated 18 December 2006
(quoted above, in 2.19), to the effect that PPI ran the risk of being held liable due to the
unauthorised modifications, must be ignored under the circumstances as set forth above,
since PPI has failed to further substantiate this.
PPI also failed to make a plausible case that PPI has suffered any (other) loss as a result of
the modifications.

*Threat to build a competing machine*

4.15    PPI contends that HMET et al. acted in violation of the Agreements by threatening to
build a competing machine (or have it built). This circumstance was one of the reasons for
PPI to terminate the Agreement, or so PPI contends.

4.16    This contention is based on Giezen's email to Minter dated 30 September 2006 (see
above, under 2.17). PPI furthermore referred to M. Minter's statement of 18 December 2006
(see under 2.19) to the effect that during a telephone conversation on 10 October 2006
Giezen and Van Aspert made threats to the same effect.
During the hearing HMET et al. explained that the email was only intended to warn PPI that
it would be very easy for an infringing party to build a similar machine and they denied that



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

they threatened at any time to build a competing machine. They assert that they would not even know how to do this.

4.17    The *voorzieningenrechter* considers that, in view of the denial, it has not been made sufficiently plausible that the alleged threat was made. The quoted email may very well be interpreted in the manner that HMEI et al. have contended and the telephone conversation referred to by Minter took place at a time when PPI was already in the process of terminating the relationship with HMET, which means that, even assuming that this conversation is correctly represented, it should be viewed in this context.
Whatever may be the case, what again applies is that the ground submitted by PPI does not justify summary termination. PPI must at least have been expected to have given HMEI the opportunity to cease any violation of the Agreements.

*Unauthorised expansion of territory*

4.18    PPI contends that HMEI et al. marketed the Power Plate outside the contractually allocated territory without being authorised to do so. PPI holds that this may be inferred, among other things, from HMEI's website www.hollandenterprisegroup.com, and from its renewed website (www.powerplate.com). According to PPI, HMEI et al. have not submitted a shred of evidence for their assertion that PPI had been aware of the information that had been published on the website www.hollandenterprisegroup.com (to which visitors of www.powerplateme.com are automatically linked, according to HMEI et al.) since 2004.

4.19    In substantiation of their assertion that PPI agreed that, in deviation from the Agreements, HMEI would not only distribute the Power Plate in the Middle East but in all Islamic countries, HMEI et al referred to the emails from M van der Meer, Van der Meer's right hand man, to Giezen and Van Aspert on 28 July 2005 and 29 July 2005, and to Van Aspert's response to that email (see above, under 2.10), regarding the countries to be included in the list of countries for ME.com. HMEI et al furthermore referred to the emails from PPI to HMEI (exhibit 8 to the summons) dated 16 January 2006, 24 August 2006, and 25 September 2006, which show that PPI forwarded 'leads' from countries other than those that were allocated to HMEI in the Agreements to HMEI, with the request to follow up those leads.

4.20    PPI denied that it had given the said consent. PPI has concluded exclusive distribution agreement all over the world, including in those countries of which HMEI et al. wrongly contend that they came to form part of their distribution territory. Moreover, the number of Islamic countries is much larger than the countries HMEI et al. mention on their own website. The fact that PPI is now being held liable as a result of unauthorised border crossing by HMEI is confirmed by the statement from M Minter. PPI denies that it continually forwarded leads to HMEI for orders from countries outside the territory contractually allocated to HMEI. PPI holds that this happened only occasionally, and solely in order to fill a vacuum that was created because of the expiration of an agreement with another exclusive distributor. HMET was in reason not allowed to infer a long-term and exclusive right of distribution from the occasional leads, let alone an exclusive right of



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

distribution for all Islamic countries. For HMEI knew that for each country an (exclusive) distribution agreement was required

4.21    The *voorzieningenrechter* considers first of all that it has neither been asserted, nor has evidence been submitted, that PPI, after it had taken note of the information published on the said websites, held HMEI to account on the conduct it now imputes to HMEI. Insofar as PPI contends that the unauthorised crossing of borders is confirmed by the agreements that HMEI apparently concluded with its agents, PPI has failed to submit these agreements to the proceedings, whereas it should have been possible for it to have done so, if it was seriously worried about the unauthorised expansion of HMEI's territory. Because if that were the case PPI would have asked HMEI to submit these agreements to it long ago. All this in itself already suggests that this "violation" of the Agreement was not as serious as it is made out to be either.

4.22    It does not have to be discussed further whether formal permission was given for the expansion of the territory that was allocated by the Agreements to HMEI. Given the inclusion on the above-mentioned website and the manner in which the 'leads' were dealt with, the *voorzieningenrechter* deems it at least likely that it had become common practice between the parties, in 2004 and 2005, that the contractual limits of the territory that was allocated to HMEI were not strictly observed. Understandably so, in an organisation in which PPI was still in the start-up phase and in which not all countries were (apparently) yet (adequately) covered by exclusive distribution agreements. It is noteworthy in this regard that PPI makes no mention of any distributors actually complaining that HMEI was distributing Power Plates within the territory that was contractually allocated to these other distributors; it must therefore be assumed that such complaints were never made. Although it is possible that the continuing development of PPI's network might have resulted in this matter being considered differently at PPI in mid-2006 from how it was in 2005, this still would not constitute a ground for termination the Agreements without first having discussed this new policy with HMEI, or without first having demanded that the Agreement would henceforth strictly be complied with, and stating concretely how this should be put into practice.

*Fictitious grounds for termination?*

4.23    HMEI et al. argue that PPI never warned HMEI about the improper conduct that is imputed to it and that PPI never demanded of HMEI that it cease this conduct. If the imputed conduct was indeed such a bone of contention for PPI, it would have been logical for PPI to demand of HMEI that it cease this conduct. For this reason it must be assumed that PPI trumped up the grounds given for summarily terminating the Agreements.

4.24    The *voorzieningenrechter* deems this a plausible argument. The imputations of PPI, as discussed above, partially bear on conduct of HMEI that had been going on for quite some time when PPI terminated the Agreements, in October 2006, and of which PPI was aware. If PPI regarded this conduct (rightly or wrongly) as a violation of the Agreements (as a result of which it suffered harm), this should have been expressed somehow in correspondence, meeting reports or other documentary evidence.



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

The fact that PPI has not submitted any emails, letters, minutes or comparable documents in substantiation of its argument, is therefore in itself already sufficient reason to assume that the real ground for terminating the Agreements is not to be found in the issues that are discussed above. It must be assumed that the real ground for termination, as HMET et al. argue, is to be found in the fact that HMET refused to conform to the wishes of the new management, which in turn was none too pleased with a distributor which asserted its rights. The emails quoted above in 2.13 - 2.16 speak volumes in this regard.

*Conclusion: wrongful termination*

The arguments put forward by PPI cannot hide the fact that the Agreements were terminated wilfully and intentionally while bypassing all contractual rules that apply between the parties, simply because PPI wanted to get rid of HMET for commercial reasons.

*The extent of the loss*

4.25    HMET et al. contend that, by virtue of the renewal clause it contained, the Agreement of 20 September 2004 could have been renewed twice with a period of 12 months, provided that HMET achieved the agreed targets, which had always been the case. Only after the third term had expired (1 October 2007) could either party terminate the Agreement, subject to a term of notice of 20 days. Before that date it was not allowed to terminate the Agreement. The Agreement of 1 June 2005 includes a similar clause. The earliest date as per which this Agreement could be terminated was 1 December 2007, also subject to a notice period of 20 days.

4.26    PPI has not denied the interpretation of the renewal clause as set forth above. It did submit, however, with a reference to article 1c of the Agreement, that HMET had failed to comply with its payment obligations and consequently with the requirements for renewal of the Agreement. It submitted in this connection that HMET failed to pay all of its invoices (or to do so in time) and that it was forced to remind HMET of this fact by email dated 10 March 2005 (see 2.6)
Since HMET had failed to comply with its payment obligation with due observance of the applicable conditions, the Agreement had lapsed after the "Initial Term" had expired, or as per 1 October 2005. Since all parties continued to do business as usual, an agreement for an indefinite period of time was created. PPI was allowed to terminate the Agreement unconditionally, with due observance of a reasonable notice period, which, under the circumstances and given the duration of the Agreement, would have to be not more than two months. According to PPI this means that, if it is held to be liable to pay compensation, it may only be held liable for loss of net profit suffered by HEMT for a maximum period of two months.

The *voorzieningenrechter* considers in this regard as follows.

4.27    Given their age and the amounts, the invoices to which the email of 10 March 2005 refers were, in the opinion of the *voorzieningenrechter*, evidently overlooked by both parties. Given that the relationship between PPI and HMET was continued, a reasonable



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

interpretation and application of the Agreement of 20 September 2004 means that the
Agreement was renewed with a period of 12 months as per 1 October 2005 and that HMEI
was again entitled to claim renewal of the Agreement with another period of twelve months,
as per 1 October 2006. This means that the earliest date as per which the Agreement of 20
September 2004 could be terminated was 1 October 2007. The earliest possible date as per
which the Agreement of 1 June 2005 could be terminated was 1 December 2007. This will
have to be taken as starting point when determining the extent of the loss.

4.28    The *voorzieningenrechter* believes for now that a sufficiently plausible case has been
made that HMEI et al. have suffered considerable loss. An exact estimate of the extent of
the loss falls outside the scope of these summary proceedings. It may suffice to state that the
accountant's report of AGN MAK of 9 December 2006, HMEI et al. submitted as exhibit
14, shows that in the period 1 October 2005 - 1 October 2006 HMEI made a net profit of
(converted) US$950,000. On the basis of the statements in the covering letter to the
accountant's report - which according to PPI signify that the figures were not obtained on the
basis of an audit of any annual accounts and that the figures submitted by HMEI are based
on an unsound administration - PPI remarked that the figures mentioned in the report are
unreliable. HMEI et al. contested this by stating that these statements must be understood in
view of the circumstance that the local accounting standards, with which the administration
complies, are not in all respects in accordance with international requirements, against which
the accountant must check his findings in order to be able to issue an opinion. Since PPI has
not contested this refutation of HMEI et al. the report is considered sound enough for the
time being to assume, taking into account the pattern of increasing profits since 2005, that in
the event of a continuation of the Agreement a net profit of at least US$ 100,000 per month
would have been made in 2007. It may be agreed with PPI that a number of expenses are no
longer made, which would have to be subtracted from this amount, but this is negligible
compared with the likelihood that, assuming the circumstance that the profit in 2006 was
four times the profit of 2005, the actual loss of profit is many times larger.

4.29    Parties discussed the question to what extent a debt, if any, HMEI owes to Power
Plate Ltd (hereinafter: "Ltd"), a company affiliated with PPI, influences the claim for
compensation. The circumstance that loss of turnover may also be suffered because it is no
longer possible to sell the products supplied by Ltd. must naturally be accounted for when
determining the loss as well. It does not matter, in that regard, whether or not these purchases
were construed in such a manner that PPI may set off a claim Ltd. has on HMEI with PPI's
debt to HMEI due to wrongful termination.

4.30    HMEI et al. asserted that Giezen and Van Aspert spent US$300,000 on marketing
last year and that they ran a Power Plate Center in Dubai, which was recently refurbished for
US$50,000 and which includes for US$100,000 in equipment.
These investments are lost, since Giezen and Van Aspert are no longer allowed to act for PPI
in the Middle East. HMEI et al. offered PPI the opportunity to limit the loss HMEI is
suffering by having it take over the Power Plate Center from HEMI, but according to A. Hekman
HMEI et al. PPI stated that it was not prepared to do so.
The *voorzieningenrechter* considers that, since PPI has not contested these arguments of
HMEI et al., they must be assumed to be correct for now.



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

*Set-off?*

4.31    PPI argued that against the claim made by HMEI, it has a claim on HMEI, due to unpaid invoices, of US$291,974.79, which means that - even if it is decided that HMEI has a claim - the claims of the parties must be set off.

4.32    PPI did not persist in its alleged claim on HMEI after it was contested by HMEI supported with reasons. HMEI acknowledged that it owes a debt to PPI UK Ltd. of US$95,150, but, as HMEI et al. rightly contended, PPI is not allowed to invoke set off in this regard, since the requirement that the parties must be each other's debtor has not been satisfied.

*The allowability of the claim in summary proceedings*

4.33    The claimed relief is for payment of a sum of money. Such claim may only be awarded in summary proceedings if the existence and the amount of the claim are made sufficiently plausible, whereas immediate relief is required due to immediate urgency and provided that the risk that the sum is not repaid - when duly weighing the interests of both parties - does not preclude awarding the claim.

*Urgent interest*

4.34    PPI adopts the view that HMEI et al. do not have an urgent interest in awarding the relief they claim.

4.35    The *voorzieningenrechter* considers that PPI has not refuted that Giezen and Van Aspert depended for their livelihood and that of their children on the income they generated through HMEI. Nor has PPI contested that as a result of the termination of the Agreements they presently do not have any income and that due to the termination of the Agreements they are no longer able to carry out any activities for PPI in the Middle East, so that they are forced to build up an existence elsewhere, for which purpose they require the necessary financial means. Nor did PPI put forward any defence against the argument of HMEI et al. that PPI has stated that its activities will be transferred to the United Kingdom and that PPI will be liquidated. All of the above sufficiently demonstrates the urgent interest that HMEI et al. have in the requested relief.

*Firmness of the claim*

4.36. It may be inferred from the above that a sufficiently plausible case has been made for the existence and amount of the claim. The possibility that a court deciding on the merits of the case will decide that PPI had sufficient grounds for not complying with its obligations under the Agreements until 1 October 2007 and 1 December 2007, respectively, does not have to be seriously taken into account within the context of the weighing of interests prescribed by the said criteria. The grounds for termination put forward by PPI and the story it submitted in support appear to be highly construed.



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

*Interest of HMET versus risk of no refunding*

4.37    PPI argues that there is a considerable risk that any amount that is awarded now will not be refunded in the event that a decision is taken against HMET et al. in proceedings on the merits. PPI pointed out in this regard what HMET et al. themselves have stated, namely that they depend for their livelihood on income they generated through HMET and that they have nothing to fall back on and are forced to build up a new existence elsewhere (in the world). This makes it certain, according to PPI, that HMET et al. will no longer be able to refund to PPI any amount they are awarded (within the context of these summary proceedings) in the event of a possibly contradictory decision of the court deciding on the merits of the case.

4.38    The circumstance that what is concerned in this case is a wilful and intentional pushing aside of a troublesome distributor, in violation of the applicable agreements, apparently because it obstructed the desire for expansion of PPI new-style, means that when awarding the requested relief the interests of HMET et al. must prevail to such extent that a provision must be made that will allow Giezen and Van Aspert to deal with the situation that has arisen as a result of the wrongful termination.

4.39    PPI will be ordered to pay HMET et al., all by way of an advance payment, a sum of EUR 500,000 as per 1 February 2007, as well as twenty monthly instalments of EUR 20,000 each (i.e. to a total amount of EUR 400,000).
This relief is deemed sufficient to allow Giezen and Van Aspert to relocate to the Netherlands with their family, to re-establish themselves there and to allow HTEM to continue to pursue its claims against PPI.

4.40    As party against whom the matter is mainly decided PPI will be ordered to pay the costs of these proceedings. The costs on the part of HTEM et al. are estimated at

| | | |
|---|---|---|
| - summons | EUR | 71.32 |
| - court fees | | 4,915.00 |
| - attorney of record's fee | | 816.00 |
| Total | EUR | 5,802.32 |

## 5.    The claim in the motion

5.1    Stated briefly, PPI claims that the *voorzieningenrechter*, by judgment in the motion having immediate effect, will order HMET et al. - who according to the summons are established in Dubai, in the United Arab Emirates - must provide security for an amount of EUR 10,539, this being the costs of the proceedings which they may be ordered to pay in the summary proceedings, such costs to be determined by the court.

5.2    The *voorzieningenrechter* considers that since according to what is considered above PPI will be ordered to pay the costs of the proceedings in the main action, it lacks any



130278/ KG ZA 06-579 and 130023 / KG ZA 06-568
17 januari 2007

interest in having the motion for providing security awarded. The motion will therefore be rejected.

5.3    HMEI et al. are deemed not to have incurred any costs in the motion other than those which have already been decided on in the main action

## 6.    The Decision

The *voorzieningenrechter*

<u>in the main action</u>

6.1    Orders PPI to pay a lump-sum to HMEI et al of EUR 500,000, by 1 February 2007 at the latest,

6.2    Orders PPI to pay to HMEI et al a sum of EUR 400,000, to be paid in twenty monthly instalments of EUR 20,000 each, for the first time on 1 March 2007 and subsequently on the first day of each month,

6.3    Orders PPI to pay the costs of the proceedings, estimated on the part of HMEI et al. until this date at EUR 5,802.32,

6.4    Declares that this judgment to this extent has immediately effect,

6.5    Refuses what is otherwise claimed,

<u>in the motion</u>

6.6    Rejects the claim,

6.7    Orders PPI to pay the costs of the proceedings, estimated on the part of HTEM et al. until this date at nil

This judgment was rendered by judge A.H. Schotman and pronounced in open session on 17 January 2007

ISSUED AS PROCESS SERVER'S COPY
To Mr Middeldorp





I, Paulus Antonius Hekman, sworn translator for the English Language, listed in the register of sworn translators of the District Court in Amsterdam, The Netherlands, do solemnly and sincerely declare that the above is a full, true and faithful translation made by me of the document annexed hereunto, which was submitted to me in copy for translation, in testimony whereof I have hereunto set my hand on this day, the twelfth of April two thousand zeven



# EXHIBIT 2

Cause list no. 178/07                                                    1

9 August 2007 (accelerated judgment)

COURT OF APPEAL IN AMSTERDAM

FOURTH THREE-JUDGE CIVIL SECTION

JUDGMENT

in the case of:

POWER PLATE INTERNATIONAL B.V.,

a private company with limited liability,

established in Amstelveen, having its place of business in
Badhoevedorp,

APPLICANT,

local counsel: A.J. Fioole,


versus


1.    HOLLAND MIDDLE EAST TRADING LTD, a legal entity under the
laws of the British Virgin Islands

2.    Franciscus Antonius Maria GIEZEN,

3.    Petronella Johanna Elizabeth VAN ASPERT,

4.    POWER PLATE TRADING LLC, a legal entity under the laws of the
United Arab Emirates,

all of them having in the first instance chosen as their address
for service the offices of lawyers J. Meuleman and M.E. Koppenol-
Laforce in Amsterdam,

RESPONDENTS,

local counsel: J. Meuleman

## 1.    The proceedings in appeal

Appellant is hereinafter referred to as: "PPI"; the respondents are
hereinafter jointly referred to as: "HMET et al.", and each
separately as: "HMET", "Giezen", "Van Aspert", and "PPT".

1.1    By summons dated 7 February 2007 PPI appealed against the
judgments of the District Court in Haarlem of 17 January 2007, in
the cases with numbers 130278 / KG ZA 06-579 (the main action) and
130023 / KG ZA 06-568 (the motion), passed between PPI as defendant
in the main action and claimant in the motion, and HMET et al. as
claimants in the main action and defendants in the motion.

1.2    By statement of appeal PPI formulated and clarified 27
grounds for appeal, and submitted a number of documents, and moved
(stated briefly) that the Court of Appeal reverse the judgments of
the court below and that it, as yet:
-      refuse the claims of HMET et al.;
-      decide that the *voorzieningenrechter* (judge hearing requests
for provisional relief) had wrongly rejected the motion to provide
security;
and that HMET et al. be ordered to pay the costs of the
proceedings.

1.3    Thereupon HMET et al. submitted a defence, together with a
number of documents, and moved (stated briefly) that the Court of
Appeal uphold the judgments of the court below and that it order
PPI to pay the costs of the proceedings.

1.4    On 25 July 2007 the parties had their cases argued; PPI by
its local counsel and by counsel P. Roorda, lawyer in Amsterdam;
HMET et al. by their local counsel and by counsel M.E. Koppenol-
Laforce, lawyer in Amsterdam. All parties had their cases argued on
the basis of pleading notes submitted to the Court of Appeal. On
that occasion the parties also submitted various additional
documents to the Court of Appeal.

1.5   Finally the parties asked that judgment be passed.

2    Assessment

2.1   In the interim judgments passed in this case on 21 December
2006 (paragraphs 2.1 and 2.2) and in the contested final judgments
(paragraphs 2.1-2.19) the *voorzieningenrechter* accepted a number of
facts in this case as established facts. There is no disagreement
about these facts, reason why the Court of Appeal will also assume
these facts.

2.2   PPI holds the rights to the name and the intellectual
property rights of the Power Plate, a piece of fitness equipment.
A.L.N. van der Meer used to be shareholder and director of PPI. PPI
has concluded a large number of exclusive distributor agreements,
in order to have third parties sell the Power Plate in territories
designated by PPI.
Under agreements dated 20 September 2004 and 1 June 2005 (the
"Agreements") PPI granted HMET the exclusive right to sell the
Power Plate in Egypt, Bahrain, Yemen, Jordan, Iran, Oman, Qatar,
Kuwait, Lebanon, the United Arab Emirates and Syria, as well as in
Saudi Arabia. The Agreements were concluded for a period of 12
months starting 1 October 2004 and 1 June 2005, respectively, and
were subsequently renewed. The Agreements are governed by
Netherlands law.
Early in 2006 the shares in PPI were acquired by a US investment
company. On 22 February 2006 Messrs. M.C. Minter, A.B.H. Fisher and
L.S. Hillman were installed as new directors of PPI. Indirectly –
via the private companies Vibe Tribe B.V. and Supervisie Sports
B.V, – Van der Meer stayed on as a director.
In mid-2006 PPI notified HMET that it intended to restructure its
enterprise and urged that changes be made to the Agreements. HMET
refused to accept these changes. By letter dated 19 October 2006
PPI terminated the Agreements with immediate effect due to breach
of contract. It stated as reason for termination:

Cause list no. 178/07                                                4

> "(...) The breaches include but are not limited to sublicensing in
> violation of article 9(a), modification of the product in violation
> of articles 3(b)and (8(a), threatening to build your own vibration
> machine in violation of article 8(b). Furthermore, you have acted
> contrary to your duties as a good distributor. (...)".

2.3    A large number of lawsuits have been conducted and are still
pending between HMET et al. on the one hand, and PPI, Vibe Tribe,
Supervisie, Minter, Fisher, Scott, and Van der Meer (hereinafter:
"PPI et al.") in varying compositions on the one hand.
(a)  By judgment in summary proceedings dated 16 November 2006
(355606 / KG 06-3407) the *voorzieningenrechter* in Amsterdam (stated
briefly) granted HMET leave to have prejudgment garnishment imposed
against PPI on Magazijn De Bijenkorf, for a maximum amount of EUR
22,000,000, provided security would be provided for a sum of EUR
250,000. HMET has not exercised this leave.
(b)  In the present case the *voorzieningenrechter* ordered PPI, by
interim judgment (summarised briefly) to keep dormant a lawsuit it
had brought in Dubai against HMET et al. until the Dutch court
would have decided on the claims of HEMT et al., on pains of
forfeiting a penalty. In the final judgment the
*voorzieningenrechter* ordered PPI in the main action (stated
briefly) to pay HMET et al. a total sum of EUR 900,000 as well as
the costs of the proceedings, and in the motion rejected PPI's
claim that security be provided for the costs of the proceedings.
(c)  By judgment in summary proceedings dated 2 January 2007
(1295557 / KG ZA 06-541) the *voorzieningenrechter* in Haarlem
rejected Van der Meer's claim to have the prejudgment attachment
lifted that HMET had levied on the household effects in his home in
Hoofddorp.
(d)  By judgment in summary proceedings dated 9 March 2007 (131861
/ KG ZA 07-44) the *voorzieningenrechter* in Haarlem (summarised
briefly) prohibited PPI et al. in the main action from executing
any acts that might result in the passports of Giezen and Van
Aspert being confiscated or in the restriction of their freedom of
movement, and prohibited PPI et al. from continuing litigating in

Cause list no. 178/07                                                   5

the case pending in Dubai, on pains of forfeiting penalties, and in
the counterclaim suspended the execution of the penalties
stipulated by the interim judgment of 21 December 2006.

(e)    On 14 March 2007 HMET et al. summoned PPI et al. to appear
before the District Court in Haarlem in proceedings on the merits.
In this case they claim (stated very briefly) damages to an amount
of EUR 22,283,300.

(f)    In a judgment in summary proceedings dated 6 July 2007,
corrected by judgment dated 18 July 2007 (135731 / KG ZA 07-275)
the *voorzieningenrechter* in Haarlem ordered PPI et al. (among other
things) to pay HMET et al. EUR 1,100,000.

2.4    Essentially, the grounds for appeal in the present case serve
to argue that the *voorzieningenrechter* wrongly:
-      concluded that the termination of the Agreements was
wrongful:
-      deemed it likely that the loss HEMT et al have suffered is
       considerable;
-      ordered PPI to pay an advance of EUR 900,000 to allow Giezen
       and Van Aspert to move with their family to the Netherlands
       and to allow HMET to continue its claims against PPI.
For this reason the grounds for appeal may be discussed
collectively.

2.5    PPI puts forward four circumstances that forced it to
terminate the Agreements. It holds that HMET:
-      granted third parties exclusive distributor rights;
-      made modifications to the Power Plates;
-      threatened to build a competing vibration machine (or have it
       built;
-      acted in breach of its obligation to act as a good
       distributor.

2.6 HMET et al. hold that HMET has not failed in the performance of
the Agreements. Within a short period of time, and with great
personal and financial efforts, they have developed the market for

the Power Plate in the Middle East and built up a profitable
enterprise. They have made considerable investments but due to the
sudden, unjustified termination of the Agreements they are unable
to enjoy the fruits thereof, as a result of which they suffer
considerable loss.

2.7 In the proceedings on the merits that HMET has brought it will
be considered whether HMET et al. have failed in the performance of
the Agreements; whether the Agreements – which, according to HMET
et al. were still Agreements for a definite period of time – were
terminated for good cause; and whether HMET et al. suffer loss to
the extent they have claimed. In order to allow (an advance to) the
monetary claim HMET et al. have brought in summary proceedings, the
Court not only has to consider whether a sufficiently plausible
case has been made for that claim, but also whether HMET et al.
have a sufficiently urgent interest, whereas when weighing the
interests of the parties the risk of no refund should also be taken
into account.

2.8    The Agreements were concluded for a period of 12 months.
Articles 1c, 1d and 1e of the Agreements include an arrangement for
their renewal. These articles read as follows:

> "1c if during the Initial Term [HMET] shall have purchased not less
> than 75 PP NG's and 75 PPP Products from [PPI] and paid the price
> set out in the Schedule for each of these Products, then [HMET]
> shall have the exclusive right to renew this Agreement for another
> 12 months period at the end of the Initial Tem ("the Second Term)
> [HMET] shall notify [PPI] not less than 20 working days before the
> expiry of the Initial Term of its desire to renew the Agreement in
> accordance with this provision
>
> 1d If during the "Second Term"[HMET] shall have purchased not less
> than 125 PP NG's and 125 PPP Products from [PPI] and paid the price
> set out in the Schedule for each of these Products then the Licensee
> shall have the exclusive right to renew this Agreement for another
> 12 months period ("Third Term) at the end of the Second Term.

> If during the "Third Term" [HMET] purchases not less than 200 PP NG
> and 200 PPP Products from [PPI] and paid the price set out in the
> Schedule for each of these Products, then the license will be
> renewed automatically tor another 12 months, unless terminated by
> either party with the express condition of giving to the other not
> less than 20 working days notice of its intention to terminate this
> agreement before the expiry of any Term.
>
> 1e If the License is not renewed at any time, the right to
> distribute and sell the Product in volume will automatically revert
> to [PPI], after which [HMET] is no longer allowed to sell or market
> the Product, or make use of the trademarks."

2.9   PPI argues that HMET has failed to (timely) comply with its
payment obligations under the Agreement of 2004, so that this
Agreement has expired as per 1 October 2005. Thereafter the parties
continued to do business together so that, according to PPI, the
Agreement has become an agreement for an indefinite period of time.
The Court of Appeal is unable to accept this argument. For it may
be inferred from articles 1c and 1e of the Agreements that if HMET
had indeed failed to comply with its payment obligations with
respect to the relevant Agreement, it would not be renewed in
October 2005 and that all rights would automatically revert to PPI.
Apparently this has not occurred, whereby the Court of Appeal
remarks that the default as asserted by PPI presumably was not
sufficiently serious cause for PPI to immediately adopt the
position at the time to state that article 1c had been violated. It
must therefore be accepted for now that the Agreement of 2004 was
renewed in October 2005 for a period of twelve months as well. This
means that, if the second paragraph of article 1d were applied, the
Agreements would not end until 1 October 2007 and 1 December 2007,
respectively, as the *voorzieningenrechter* also considered. PPI's
termination as per 19 October 2006 is therefore a termination of
agreements that had been concluded for a definite period of time.

2.10  In paragraphs 4.3-4.22 of the final judgment, the
*voorzieningenrechter* extensively discussed the four grounds for

termination referred to above in 2.5. He concluded that the
termination of the Agreements was wrongful and occurred whilst
ignoring all contractual rules applicable between PPI and HMET,
simply because PPI wanted to get rid of HMET for commercial
reasons.

2.11  PPI submitted in appeal (summarised briefly) that HMET's
breach was more serious than the *voorzieningenrechter* assumed and
that is was incapable of being remedied. PPI contests that the
grounds for termination were fabricated.

2.12  The Court of Appeal deems it likely that HMET was allowed to
engage sub-distributors in order to increase the sales of the Power
Plate in the Middle East, provided that after the agreements with
HEMT were terminated, PPI would not be faced with independent
claims from third parties to intellectual property rights and/or
distribution rights with respect to the Power Plates. From what has
been brought forward and has become evident in these proceedings so
far, it is not possible for the Court of Appeal to conclude with
sufficient certainty that this was the case.
PPI did submit that HMET came to adopt the view towards its sub-
distributors that the intellectual property rights to the Power
Plates rested with HMET and not (or no longer) with PPI, but PPI
has failed, so far, to sufficiently substantiate this with facts.
HMET is a company organised and existing under the laws of the
British Virgin Islands, and has its place of business in the JAFZ
free-trade zone in Dubai. Under the laws of the United Arab
Emirates it is consequently obliged to carry on its activities in
that state via a company such as PPT, the majority of shares of
which is held by a resident of that state. It has not been
contested that HMET has transferred its distribution rights to PPT,
but this does not mean that HMET has failed towards PPI, especially
since there is no evidence that after the Agreements had been
terminated PPT adopted the view that it is (still) entitled to an
exclusive right for the United Arab Emirates or for other
countries.

The modifications to the Power Plates consisted of HMET rendering Chinese characters on the machines invisible by spraying them over. It is as yet unclear whether PPI consented with this, as HMET et al. argue, but which PPI denies. PPI did assert that by spraying over the characters HMET incurred the risk of the local authorities imposing sanctions on HMET et al. or PPI, but for now it has to be decided that this is highly speculative.

With respect to the threat to place a machine on the market that would be comparable with the Power Plate, PPI refers in its notice of appeal to a statement made by Minter, dated 18 December 2006, in which Minter declares that during a telephone conversation he had with Giezen and Van Aspert on 10 October 2006:

> *"they stated that they had the ability to create similar products themselves, and that they would do so and sell such products to these unapproved global customers if I did not agree to let them sell the PPI products (...) to global customers (e. g. hotel chains, multinationals)"*

HMET et al. contest that they made such a threat but do not dispute the content of the telephone conversation. The Court notes in this regard that the telephone conversation took place shortly before the termination, when there already was large disagreement between HMET et al. and PPI regarding the continuation of the Agreements. There is still much unclear about the activities HMET et al. undertook outside the countries that were allocated to HMET. On the one hand it is a fact that HMET et al. announced on a *website* that it was allowed to distribute the Power Plate in other countries than the ones that were allocated to it as well. On the other hand, it has been satisfactorily shown that PPI passed on so-called *leads* to HMET from time to time, i.e. customers living outside the territory of HMET, requesting HMET to sell the Power Plates to these customers.

2.13  From the considerations in 2.12 it may be concluded that HMET did not comply with what the parties had agreed at all times. What should now be considered is whether the shortcomings of HMET were so serious that they justified the summary termination of the

Cause list no. 178/07                                                  10

Agreements or that these shortcomings could have been remedied, as
provided for in the Agreements under the heading "*9. Termination*":
> "*(...) If either party fails to comply with any of the terms of this
> Agreement, or fails within one month of being requested to do so, to
> remedy a bread capable of being remedied, the other party may
> terminate this Agreement by summary notice in writing (...)*"

It may be assumed that HMET was entitled to appoint local
representatives or agents. It has not been established, for now,
that in doing so it granted sub-distributors exclusive rights, to
such extent that this constituted a serious breach of the
Agreements. Consequently, in the provisional assessment of the
Court of Appeal this may not have constituted ground for
terminating the Agreements.

It has been sufficiently established that HEMT had the Chinese
characters on the Power Plates sprayed over. HMET is unable to
remedy this with respect to the Power Plates that have already been
sold and delivered in this condition. However, the Court of Appeal
deems this an insufficiently serious breach to justify the summary
termination of the Agreements, also because they were concluded for
an indefinite period of time, for the performance of which HMET was
forced to incur huge costs, without this being immediately offset
by sufficient income. This means that (the Board of) PPI could very
well have understood that summary termination would result in huge
losses for HMET, whereas it has furthermore not been shown that
spraying over the characters has affected the sale of the Power
Plates in any way.

Even if Giezen and Van Aspert did seriously threaten to place an
alternative of the Power Plate on the market – something that HMET
et al. deny – PPI could easily have pointed out to HMET et al. the
relevant provision of the Agreement and have stipulated a term in
which to withdraw this threat, as is required under article 9 of
the Agreements.

The same applies to the extra-contractual expansion of the
territory in which HMET was active. Not only did PPI urge HMET from
time to time to market the Power Plate outside its territory, but
if it had wanted to meticulously enforce the territorial
boundaries, it should have allowed HMET a term of one month, as

from 19 October 2006, to bring its conduct in line with the Agreements.

2.14  What may be concluded from the above considerations is that PPI terminated the Agreements without sufficient cause, so that HMET is entitled to compensation to an amount at least equal to the profit it could have realised until the Agreements for an indefinite period of time had expired. It is evident that, in addition, Giezert and Van Aspert are also suffering loss, since they were suddenly deprived (which has been insufficiently contested) of a major source of income. Moreover, in their own account they have moved with their family from Dubai to Westerbork where they have registered themselves in the municipal personal records database of the municipality of Beilen. The loss suffered by PPT is also derived from the loss HMET has suffered, since after the termination of the Agreement PPT (and this is not contested) was no longer able to undertake any activities either with respect to the sale of the Power Plates.
All this results in sufficiently urgent cause for allowing an advance in summary proceedings on damages to be decided in the proceedings on the merits.

2.15  On the basis of an audit opinion submitted by HMET et al. the *voorzieningenrechter* ordered PPI to pay a sum of EUR 900,000. The Court of Appeal deems this sum acceptable as an advance. It may be true that the audit opinion HMET et al. have submitted does not comply with all the requirements stipulated for such opinion (in the Netherlands), but as guideline for determining the advance and in the absence of other properly substantiated data the Court of Appeal deems this opinion sufficient.

2.16  PPI also pointed out the considerable risk of no refund, since HHET and PPT are established in countries with which there is no treaty for the enforcement of judgments, whereas Giezen and Van Aspert have shown that they are transient people who may possibly decide to settle outside the Netherlands again as soon as they have

received the advance. Although the Court of Appeal deems that there is a real risk of no refund, given the interests of HMET et al., who are wound up in a large number of expensive lawsuits for which they need liquid resources, whereas it has been insufficiently contested that Giezen and Van Aspert depended to a very high degree on their income from HMET, the Court of Appeal deems this risk insufficient to refuse the claim as allowed by the *voorzieningenrechter*.

2.17   In addition PPI claimed that the Court of Appeal decide that the *voorzieningenrechter* wrongly rejected the motion for providing security. This claim concerns a declaratory judgment for which summary proceedings do not lend themselves, so that this claim must be rejected.

2.18   The judgment of the court below will be upheld. As party against whom the matter is decided PPI will be ordered to pay the costs of the proceedings in appeal.

## 3      The Decision

The Court of Appeal:

Upholds the judgment of the court below;

Rejects everything else that PPI has claimed in appeal;

Orders PPI to pay the costs of the appeal proceedings and estimates these costs insofar as they have been incurred until this date on the part of HMET et al., at EUR 2,700 in disbursements and EUR 2,682 in fees for the local counsel;

Declares that this judgment has immediately effect.

Cause list no. 178/07                                                    13

This judgment was passed by judges J.H. Huijzer, W.J.J. Los and
G.C. Makkink and pronounced by the cause list judge as accelerated
judgment in public session on 9 August 2007.

# EXHIBIT 3

135731/KG ZA 07-275
6 July 2007

# IN THE NAME OF THE QUEEN

## judgment

**HAARLEM DISTRICT COURT**

Civil-law section

Case/cause list no.: 135731 / KG ZA 07-275

**Judgment in summary proceedings of 6 July 2007**

in the case of
1.       **HOLLAND MIDDLE EAST TRADING LTD,**
a legal entity under the laws of the British Virgin Islands,
established in Jebel Ali Free Zone, Dubai, United Arab Emirates,
2       **FRANCISCUS ANTONIUS MARIA GIEZEN,**
residing in Dubai, United Arab Emirates,
3.       **PETRONELLA JOHANNA ELIZABETH VAN ASPERT,**
residing in Dubai, United Arab Emirates,
4.       **POWER PLATE TRADING LLC,**
a legal entity under the laws of the British Virgin Islands,
established in Dubai, United Arab Emirates,
claimants in the main action,
defendants in the counterclaim,
also defendants in the motion,
local counsel: M. Middeldorp
counsels:  M.E. Koppenol-Laforce and J. Meuleman in Amsterdam,

versus

1       **POWER PLATE INTERNATIONAL B.V.,**
a private company with limited liability
having its place of business in Badhoevedorp, municipality of Haarlemmermeer,
2.       **MARK CLIVE MINTER,**
residing in Chicago, Illinois, USA,
3.       **ALLAN BRIAN HENRY FISHER,**
residing in London, United Kingdom,
4.       **LEE SCOTT HILLMAN,**
residing in Glencoe, Illinois, USA,
defendants in the main action,
claimants in the counterclaim,
claimants in the motion,
local counsel: L. Koning,
counsels: A J. Fioole and P. Roorda in Amsterdam,
5       **AUGUSTINUS LEONARDUS NICOLAAS VAN DER MEER,**
residing in Hoofddorp, municipality of Haarlemmermeer,
6.       **VIBE TRIBE B.V.,**

135731/KG ZA 07-275
6 July 2007

---

a private company with limited liability
established in Amstelveen,
7.    **SUPERVISIE SPORTS B.V.,**
a private company with limited liability
established in Amstelveen,
defendants in the main action,
claimants in the motion,
local counsel: J.P. Koets.

Claimants in the main action, defendants in the counterclaim, will hereinafter separately be referred to as HMET Ltd, Giezen, Van Aspert, and PPT, and jointly, in the singular, as HMET.

Defendants in the main action and claimants in the counterclaim 1-4 will hereinafter separately be referred to as PPI BV, Minter, Fischer, and Hillman and jointly, in the singular, as PPI.

Defendants in the main action 5-7 will hereinafter separately be referred to as A. van der Meer, Vibe Tribe, and Supervisie Sports and jointly, in the singular, as Van der Meer.

1.    **The motion**

1.1.    PPI and Van der Meet have claimed in a motion that the *voorzieningenrechter* (Judge hearing applications for preliminary relief) order HMET, which, according to the summons, is established in Dubai, United Arab Emirates, to provide security for the costs of the proceedings they might be ordered to pay in these summary proceedings. They estimate these costs at EUR 10,524 each, of which EUR 9,475 in local counsel's fees. They requested the *voorzieningenrechter* to take a decision on the motion before hearing the case in the main action.

1.2.    Thereupon, the *voorzieningenrechter* decided that in previous summary proceedings between the parties the costs that were awarded were the costs usually awarded in summary proceedings, or EUR 816. The *voorzieningenrechter* deems that there is no ground to depart from this in the present case. When so asked the lawyers of HMET declared during the hearing that they would stand surety for the costs of the proceedings for a maximum amount of EUR 20,000. This is considered sufficient security in the present case. There is no ground to award costs in the motion.

2.    **The further course of the proceedings**

2 1.    The further course of the proceedings appears from:
-    The summons
-    The hearing
-    HMET's pleading notes
-    PPI's pleading notes
-    Van der Meer's pleading notes
-    PPI's counterclaim.

2.2.    Finally judgment was set.

135731/KG ZA 07-275
6 July 2007

---

### 3.    The facts

3 1      Giezen and Van Aspert are the natural persons behind HMET Ltd and PPT. Minter, Fisher, Hillman and A. van der Meer are the (indirect) directors of PPI BV. A. van der Meer is director van Supervisie Sports, which company in turn is director of Vibe Tribe, one of the directors of PPI BV.

3 2.     On 20 September 2004 and 1 June 2005 PPI BV and HMET Ltd. concluded two distributor agreements, by virtue of which HMET Ltd. was granted the exclusive right to sell, within a contractually agreed territory, a piece of fitness equipment called the Power Plate, the intellectual property rights of which were held by PPI BV. On 19 October 2006 PPI BV terminated these agreements.

3 3.     PPI BV brought a lawsuit against HMET Ltd., Power Plate Middle East, Giezen, Van Aspert and PPT before the Dubai Courts of First Instance (United Arab Emirates), in which it claims compensation to the sum of EUR 28,000,000. On 21 December 2006 the *voorzieningenrechter* in this court ordered PPI BV, on pains of forfeiting a penalty, to withdraw this claim. In a subsequent execution dispute the *voorzieningenrechter* prohibited PPI BV, Minter, Fisher, Hillman and A. van der Meer, on pains of forfeiting a penalty (stated briefly) from executing any acts that might result in the passports of Giezen and Van Aspert being confiscated, and from reactivating the afore-mentioned lawsuit in Dubai until a decision was taken, in a final judgment to be passed in proceedings on the merits to be brought before the Haarlem District Court, on PPI BV's liability towards HMET Ltd.

3.4.     In a provisionally enforceable judgment in summary proceedings, passed on 17 January 2007, the *voorzieningenrechter* of this court decided that the termination of the distributor agreements mentioned in 3.2 was wrongful and ordered PPI BV to pay HMET an advance on the compensation, of EUR 500,000, to be paid on 1 February 2007 at the latest, and of EUR 400,000 to be paid in twenty monthly instalments of EUR 20,000 each. PPI BV was also ordered to pay the costs of the proceedings, to an amount of EUR 5,802.32. PPI BV has appealed against this judgment.

3 5.     On 30 October 2006 HMET had pre-judgment garnishment levied against PPI BV on Rabobank in Amsterdam. On 25 January 2007 HMET had the bailiff's copy of the judgment of 17 January 2007 served on Rabobank. On 26 and 29 January 2007 the Tax Authorities also had attachment levied against PPI BV on Rabobank. Due to the privilege of the Tax Authorities, the entire balance of PPI BV with Rabobank went to the Tax Authorities.

3 6.     On 22 February 2007 HMET had executory garnishment levied on Rabobank Amstel en Vecht. On 26 February the Tax Authorities also had attachment levied. Again, the entire balance went to the Tax Authorities.

3.7.     On 16 February 2007 bailiff M. Verheij levied executory attachment on 12 new Power Plates at the offices of PPI BV. The Power Plates were withdrawn from the attachment by PPI BV.

135731/KG ZA 07-275
6 July 2007

---

On 20 April 2007, on the urging of HMET, PPI BV made 12 other Power Plates available for sale under execution.

3.8.     To date, HMET has managed to collect some EUR 40,000 of its claim against PPI BV, as mentioned to in 3.4.

3.9.     On 14 March 2007 HMET brought proceedings on the merits against PPI, Van der Meer, Power Plate International Ltd – a company under the laws of the United Kingdom ("PPI UK"), PPI Acquisition BV and Special Sports Beheer BV. HMET claims in these proceedings (inter alia) EUR 22,283,300 in compensation due to wrongful termination of the distributor agreements.

3.10.    By public notification published in newspaper Het Parool on 26 May 2007, PPI Acquisition BV and PPI UK summoned Giezen and Van Aspert to appear before the The Hague District Court on 5 September 2007. The lawyers of Giezen and Van Aspert came across this notification by accident, when they read the notification for that session in the Parool.

## 4.     The dispute in the main action

4.1.     HMET claims that the *voorzieningenrechter*:
principally: orders PPI BV, Minter, Fisher, Hillman, A. van der Meer, Vibe Tribe and Supervisie Sports, jointly and severally, to pay an advance on compensation of EUR 6,000,000,

alternatively: orders PPI BV, Minter, Fischer, Hillman, A. van der Meer, Vibe Tribe and Supervisie Sports, jointly and severally, to pay an advance on compensation to be decided by the *voorzieningenrechter*,

as second alternative: orders PPI, Minter, Fischer, Hillman, A. van der Meer, Vibe Tribe and Supervisie Sports, jointly and severally, to pay the advance already awarded against PPI BV, to the sum of EUR 585,802.32 as a lump sum and EUR 320,000 in 16 monthly instalments of EUR 20,000 each, as from July 2007,

in each instance to be increased with the statutory commercial interest, or with the statutory interest, as from the day of the summons, or as from the day on which the judgment to be passed is served, until the day on which payment is made in full.

4.2.     PPI and Van der Meer put forward a defence. Insofar as they are relevant, the arguments of the parties shall be discussed below.

## 5.     The dispute in the counterclaim

5.1.     PPI claims that the execution of the judgment in summary proceedings, passed by the *voorzieningenrechter* in this court on 17 January 2007 be suspended and that the executory attachments levied by HMET against PPI be lifted,

135731/KG ZA 07-275
6 July 2007

5.2.    HMET put forward a defence. Insofar as they are relevant, the arguments of the parties shall be discussed below.

6.    **Assessment of the counterclaim**

6.1.    There is cause to first discuss the counterclaim. PPI demands in counterclaim that the execution of the judgment of 17 January 2007 be suspended and that the executory attachments levied by HMET be lifted.

6.2.    The *voorzieningenrechter* puts foremost that the execution of a judgment that is declared provisionally enforceable may only be interfered with if the right to execute is abused. This means that the counterclaim does not concern the question whether the judgment of 17 January 2007 was rendered on correct grounds, but whether HMET, also in view of the interests of PPI, has no interest that must reasonably be respected in asserting its right to execute that judgment in anticipation of the outcome of the proceedings in appeal. This may for instance be the case in the event of a manifest legal or factual error, or if, on the grounds of facts that have come to light or that have occurred after judgment was passed, the execution would manifestly create a contingency for the debtor (Supreme Court, 22 April 1933, NJ 1984, 145).

6.3.    Referring to its notice of appeal, PPI argued that there is a good chance that the judgment of 17 January 2007 will be reversed in appeal. It holds that Giezen and Van Aspert wrongfully appointed subdistributors, that they made unauthorised modifications to the power plates and that the territory allocated to HMET Ltd was enlarged without authorisation and furthermore that the loss that was allegedly suffered is much lower than HMET has asserted and that there is a considerable risk of no restitution. However, the *voorzieningenrechter* has already extensively discussed these arguments in his judgment of 17 January 2007. PPI has failed to make a plausible case that in this judgment manifest legal or factual errors have been made, nor has it brought forward any new facts that have come to light or that have occurred after judgment was passed, on which ground it has to be assumed that as a result of executing the judgment a contingency will arise on the part of PPI. All that PPI has done is give a different view vis-à-vis the decision of the *voorzieningenrechter* in his judgment of 17 January 2007, but this provides no ground to suspend the execution of the judgment. In the event of an execution dispute the *voorzieningenrechter* is not allowed to assess the chance that the appeal will succeed, and the mere possibility that the Court of Appeal will arrive at a different assessment regarding the points of difference that formed the object of the previous summary proceedings does not signify that HMET abuses its right to execute the judgment. What is also considered in this respect is that providing security against the lifting of the attachments is not a point of contention here, since the attachments are executory, rather than conservatory (pre-judgment), attachments.

6.4.    The above signifies that the counterclaim cannot be awarded. As party against whom the matter is decided, PPI will be ordered to pay the costs of the counterclaim, with the understanding that HMET is not considered to have incurred any additional costs in respect of the counterclaim.

135731/KG ZA 07-275
6 July 2007

**7.      Assessment of the main action**

7.1.      In the main action HMET claims an advance of EUR 6,000,000 on the compensation from PPI BV and its directors in connection with the wrongful termination of the distributor agreements. In an explanation HMET stated that so far the execution of the judgment of 17 January 2007 had yielded no or hardly any result, due to the actions of the directors of PPI BV. For this reason there is ground, HMET argues, to hold the directors liable for the loss HMET has suffered. This loss includes the extremely high costs of executing the judgments rendered in the Netherlands abroad.

7.2.      It has already been decided in the counterclaim that there are no grounds to suspend the execution of the judgment of 17 January 2007. In that judgment PPI BV was ordered by way of advance, to pay HMET the sum of EUR 900,000 as well as the costs of the proceedings, to the sum of EUR 5,802.32. It has been determined that PPI BV has failed to effect any voluntary payment in satisfaction of that award. HMET has asserted, and it has not been contested, that it had levied some 30 attachments in order to collect the advance it was awarded. These attachments had no effect, save for two garnishments on Rabobank. In both these latter instances, the Tax Authorities levied attachment on the bank balances of PPI BV shortly after they were garnished by HMET, whereupon the garnished amounts had to be surrendered in their entirety to the tax authorities. PPI has not contested that it informed the Tax Authorities of the garnishment by HMET. Nor has it contested that PPI BV has withdrawn twelve power plates that were under executory attachment from that attachment. All efforts of HMET to execute the judgment have yielded only some EUR 40,000, a fraction of the costs that were involved in that execution.

7.3      This is set off by the fact that, as HMET has asserted and which has not been contested, that on 16 March 2007 PPI BV did pay a business relation a sum of EUR 1,200,000 as part of a settlement and that it pays more than EUR 10,000 every month in rent for its business premises in Badhoevedorp.

7.4      Furthermore PPI has not contested that in 2005 PPI BV still had EUR 727,444 in tangible assets on its balance sheet, but that it no longer has any registered property registered in its name. Nor has it been contested that PPI BV has transferred its intellectual property rights to two of its affiliates.

7.5.      Against the background of what is stated above, the conclusion is justified, for now, that not only do PPI BV and its directors refuse to satisfy their payment obligations, but also that Minter, Fisher, Hulman and Van der Meer, as the (indirect) directors and de facto policymakers within the company, have actively and intentionally caused (virtual) every attempt of HMET to collect its claim on PPI BV to fail and in doing so have wilfully frustrated the execution of the judgment of 17 January 2007, whereas HMET was faced with extremely high execution costs. The blame that must be attached to the directors personally in this matter is so serious that their acts must be qualified as wrongful acts. This means that they are personally liable for the loss that has been caused as a result. Another reason for this assessment is the manner in which PPI BV and its directors have acted in the various proceedings against HMET so far.

135731/KG ZA 07-275
6 July 2007

The lawsuit in Dubai mentioned under Facts (legal ground 3.3) and the public summons without sending a copy thereof to the lawyers of the counterparty (legal ground 3.10) justify the conclusion that the financial interests in this case are apparently so large that no means will be left untried and that even the most basic standards of decency may be violated. For this reason there is every cause to order the (indirect) directors of PPI BV to pay HMET an advance on the compensation up to the amount determined by the *voorzieningenrechter* in his judgment of 17 January 2007, of EUR 900,000, of whom it was concluded above that they wilfully frustrated the execution. This sum has to be increased with an amount for the costs of legal representation and other legal costs that were incurred (in vain) in respect of the execution, which costs are also to be considered as loss suffered as a result of the afore-mentioned wrongful acts of the directors of PPI BV. For the time being these costs are estimated at EUR 200,000. The claimed statutory commercial interest may also be awarded, since no defence has been put forward against it.

7.6.     HMET believes that there are grounds for awarding a higher advance. However, the *voorzieningenrechter* believes that by awarding the above-mentioned sums a sufficient preliminary provision is made. Assessing the final amount of the compensation is reserved to the court passing judgment in the proceedings on the merits, which shall also decide the question whether and to what extent the directors of PPI BV may be held liable in their private capacities for any other loss suffered by HMET as well. It should be noted that the directors' liability determined for the time being in this judgment does not imply a (provisional) assessment regarding the question whether the directors of PPI BV may be held liable in their private capacities, other than because they frustrated the execution of a judgment that was declared provisionally enforceable.

7.7.     As parties against whom the matter is largely decided PPI and Van der Meer will be ordered to pay the costs of these proceedings.

## 8.     The decision

The *voorzieningenrechter*

### in the main action

8.1.     orders Minter, Fisher, Hillman, A. van der Meer, Vibe Tribe and Supervisie Sports, jointly and severally, to pay HMET the sum of EUR 1,100,000 (one million one hundred thousand Euros) plus the statutory commercial interest as from the day of the summons until the day on which payment is made in full,

8.2.     orders PPI to pay the costs of the proceedings, estimated until the pronouncement of this judgment on the part of HMET at EUR 4,913.10 in disbursements and EUR 816 in local counsel's fees,

8.3     declares that this judgment is provisionally enforceable,

8.4.     rejects what was otherwise claimed,

135731/KG ZA 07-275
6 July 2007

---

**in counterclaim**

8.5.    refuses the demanded provisions,

8.6.    orders PPI to pay the costs of the proceedings, estimated until the pronouncement of this judgment on the part of HMET at nil,

This judgment was passed by judge Th. S. Röell and pronounced in open session on 6 July 2007.

*[signed]*

*[stamp]*                FOR BAILIFF"S COPY
                         Issued to local counsel *M. Middeldorp*
                         The registrar of the court *[signed]*

Conc.: 134