# EXHIBIT A

IN THE NAME OF THE QUEEN

# judgment

**HAARLEM DISTRICT COURT**
Civil-law Section

Case / cause list number: 130278 / KG ZA 06-579 and 130023 / KG ZA 06-568

**Judgment in summary proceedings, dated 17 January 2007**

in the case of

**1. HOLLAND MIDDLE EAST TRADING LTD.,**
a legal entity organised and existing under the laws of the British Virgin Islands, established in Dubai, United Arab Emirates,
**2. FRANCISCUS ANTONIUS MARIA GIEZEN,**
residing in Dubai, United Arab Emirates,
**3 PETRONELLA JOHANNA ELIZABETH VAN ASPERT,**
residing in Dubai, United Arab Emirates,
**4. POWER PLATE TRADING LLC,**
a legal entity organised and existing under the laws of the United Arab Emirates, established in Dubai, United Arab Emirates,
claimants in the main action,
defendants in the motion,
counsel: M E Koppenol-Laforce and J Meuleman in Amsterdam,
local counsel: M. Middeldorp,

versus

**POWER PLATE INTERNATIONAL B V,**
A private company with limited liability
having its registered office in Amstelveen and its place of business in Badhoevedorp,
defendant in the main action,
claimant in the motion,
counsel: A. J Fioole and E.A.V. van Dam in Amsterdam
local counsel: H.K. Garvelink

Hereinafter claimants will be referred to as: "HMET", "Giezen", "Van Aspert" and "Power Plate Trading".
Together they will be referred to as: "HMET et al." Defendant will hereinafter be referred to as: "PPI".

PAULUS A. HEKMAN SWORN TRANSLATOR





**1. The proceedings**

1 1 By judgment in summary proceedings dated 21 December 2006, the *voorzieningenrechter* (Judge hearing applications for provisional relief) decided on the claim as represented in that judgment in 3 1(II). With respect to the claims represented below in 3.1 as well as with respect to the motion for providing security a decision will be taken in the present judgment, in accordance with what is decided in the said judgment under 1 2

1.2 The course of the proceedings (insofar as it pertains to the points in dispute that are as yet unresolved) appears from:

- the summons of 7 December 2006;
- the exhibits submitted on the part of HMET et al. by letter dated 14 December 2006 (numbered 1 to 14, inclusive);
- the document containing a motion for providing security on the part of PPI, transmitted by fax on 14 December 2006;
- the exhibit submitted on the part of HMET et al. by letter dated 18 December 2006 (numbered 15 to 18, inclusive);
- the exhibits submitted on the part of HMET et al. by letter dated 18 December 2006 (numbered 19 to 21, inclusive);
- a letter sent by fax on the part of PPI dated 18 December 2006, with enclosure;
- a letter sent by fax on the part of PPI dated 19 December 2006, with enclosures;
- the pleading notes of counsels Koppenol-Laforce and Meuleman;
- the pleading notes of counsels Fioole and Van Dam;
- the exhibits submitted at the hearing on the part of PPI (numbered 1 to 20, inclusive);
- a letter on the part of HMET et al. dated 28 December 2006;
- a letter sent by fax on the part of PPI dated 29 December 2006;
- a letter sent by fax on the part of HMET et al. dated 2 January 2006, with enclosure;
- a letter sent by fax on the part of PPI dated 3 January 2007;
- a letter sent by fax on the part of PPI dated 5 January 2007, with exhibits (numbered 21 to 23, inclusive);
- a letter sent by fax on the part of PPI dated 5 January 2007, with enclosure;
- a letter sent by fax on the part of HMET et al dated 5 January 2007

1.3 On the occasion of the oral hearing, held on 19 December 2006, the *voorzieningenrechter* agreed with the parties that due to the late submission of exhibits by PPI, HMET et al would be given the opportunity to respond in writing to PPI's exhibits and that subsequently PPI would be given the opportunity to respond to the response of HMET et al. Thereupon, the parties submitted their respective responses, by (fax) letter of 28 December 2006 and 5 January 2007, respectively. By the latter-mentioned letter sent by fax 3 new exhibits were submitted on the part of PPI (numbered 21 to 23, inclusive). By letter sent by fax dated 5 January 2007 HMET et al asked the *voorzieningenrechter* not to take PPI's letter and the exhibits thereto into consideration. The *voorzieningenrechter* granted this request, with the understanding that exhibits 21 to 23, inclusive, will not be considered and that he has not taken into consideration the statements in PPI's response in the said letter of 5 January 2007, insofar as these contain more than a response to the statements made on the part of HMET et al. as included in their letter of 28 December 2006.

PAULUS HEKMAN SWORN TRANSLATOR





1.4 Judgment was set to be pronounced on 17 January 2007.

**2. The facts**

2.1 Giezen is director of HMET. Van Aspert is the sole shareholder of HMET. In addition, Van Aspert is the sole shareholder and director of Power Plate Trading.

2.2 Until the beginning of 2006 PPI was the company of Guus van der Meer. It owns the rights to the name and to the intellectual property rights to the Power Plate, a piece of fitness equipment that can be used to exercise muscles and to lose weight.

2.3 PPI has concluded distribution (licensee) agreements with a large number of distributors all over the world, which provide for the distribution of the Power Plate by these distributors in the territories that are allocated to them.

2.4 PPI ("Licensor") and HMET ("Licensee") have concluded a "Licensee Agreement" dated 20 September 2004. This agreement provides, *inter alia*:

(...)

*A The Licensor has developed a product known as Power Plate® for Body Vibration® training, being Power Plate Personal and Power Plate Next Generation (hereinafter called "the PPP and PP NG")*

*(..)*

*D The Licensee wishes to obtain the exclusive rights to sell the Product in Egypt, Bahrain, Yemen, Jordanian, Iran, Oman, Qatar, Kuwait, Lebanon, UEA and Syria, and the Licensor agrees to grant the licence to distribute and sell on and subject to the terms of this agreement*

*WHEREBY IT IS MUTUALLY AGREED AS FOLLOWS*

*la 1 a The Licensor hereby grants the Licensee the exclusive rights to distribute, market and sell the Product using the trademarks in the Territory, and the Licensee agrees to act as the sole distributor to the Licensor under the terms of this agreement*
*The Licensor nor the Licensee shall authorise any third party, person, firm or company, to use the trademarks or sell or market the products within the Territory during the term of this Agreement*

*1b The license hereby granted shall continue for a period of 12 months commencing on 1st October 2004 ("the Initial Term'? and shall on expiry of 12 months automatically terminate unless the provisions f clause IC below apply*

*1c If during the Initial Term the Licensee shall have purchased not less than 75 PP NG's and 75 PPP Products from the Licensor and paid the price set out in the Schedule for each of these Products, then the Licensee shall have the exclusive right to renew this Agreement for another 1.2 months period at the end of the Initial Term ("The Second Term"). The Licensee shall notify the Licensor not less than 20 working days before the expiry of the Initial Term of its desire to renew the Agreement in accordance with this provision.*

PAULUS A. HEKMAN SWORN TRANSLATOR





*1d If during the "Second Term" the Licensee shall have purchased not less than 125 PP NG and 12 5 PPP Products from the Licensor and paid the price set out in the Schedule for each of these Products then the Licensee shall have the exclusive right to renew this Agreement for another 12 months period ("Third term") at the end of the Second Term*

*If during the "Third Term" the Licensee purchases not less than 200 PPNG and 200PPP Products from the Licensor and paid the price set out in the Schedule for each of these Products, then the license will be renewed automatically for another 12 months, unless terminated by either party with the express condition of giving to the other not less than 20 working days notice of its intention to terminate this agreement before the expiry of any Term*

*1e If the licence is not renewed at any time, the right to distribute and sell the Product in volume will automatically revert to the Licensor, after which the Licensee is no longer allowed to sell or market the Product, or make use of the trademark*

*1If The license and rights to distribute the Product created by the terms of this agreement may not be assigned or otherwise transferred to any party by the Licensee, without the prior written consent of the Licensor*
*(...)*
*3b The Licensee can alter the product -including minor details -only with the prior written permission of the Licensor on beforehand*
*( . )*
*8 a The product may not be resold in any form or condition than the form or condition in which the Product was originally supplied to Licensee by Licensor*
*b Licensee is not allowed to enter into any agreement with any third party for the distribution in the Territory of products similar to or competitive with the Product*
*( . )*
*9 Termination*
*I If either party fails to comply with any of the terms of this Agreement, or jails within one month of being requested to do so, to remedy a breach capable of being remedied, the other party may terminate this Agreement by summary notice in writing*
*( . )*

2.5 At the end of 2004 Giezen and Van Aspert departed for Dubai with their three children to take up the activities as distributor of the Power Plate there, in accordance with the above-mentioned agreement

2.6 In an email dated 10 March 2005 Ch. de Groot (assistant operations manager at PPI) informed Giezen and Van Aspert as follows:
*(...) I had a look at the finances, which unfortunately must be done as well, and regret to say that I found that not all invoices have been paid yet These invoices date back to long ago, and include those for the contribution towards the marketing costs and for the final delivery of PP Ng from DECEMBER 2005*

PAUL ... EKMAN SWORN TRANSLATOR





*Enclosed I send you copies of the relevant invoice.*
*The total amount is Euro 7,250 on the invoices that were made in the name of Expeditors at the time (..); the other is for Euro 9,237.50 for the 5 NG.*

*You will understand that both invoices have to paid immediately.*

2.7 In an email dated 29 March 2006, Giezen wrote to Ch. de Groot:
*(..) Could you look into the possibility to delete the Chinese characters when replacing the rubbers? I use a spray can with red paint for the purpose. As I already told you before, the people here are not in favour of Chinatown products, no matter how good they are. Furthermore, we require a certificate of origin for a number of countries, which is, of course, the Netherlands. And people around here know that we still do not write in Chinese script in the Netherlands (..)*

2.8 In an e-mail from I van Deijssel, of PPI, to HMET dated 31 May 2005 the following is stated:
*(..) I herewith wish to briefly mention the matters we discussed and which I will communicate to the organisation.*
*(..)*
*Power Plate ME works with sub-distributors, with whom agreements are made (..)*

2.9 In addition, PPI and HMET concluded a "Licensee Agreement" dated 1 June 2005. In this agreement, which is virtually identical to the agreement of 20 September 2004, the following is stipulated in derogation from the earlier agreement:
*(...)*
*D The Licensee wishes to obtain the exclusive rights to sell the Product in Saudi Arabia, (the Territory) and the Licensor agrees to grant the license to distribute and sell on and subject to the terms of this agreement*
*(..)*
*1b The license hereby granted shall continue for a period of 12 months commencing on 1st June 2005 ("the Initial Term") and shall on expiry of 12 months automatically terminate unless the provisions of clause IC below apply*

*1c If during the Initial Term the Licensee shall have purchased not less than 20 PP NG's Products and 5 PP Personal Products from the Licensor and paid the price set out in the Schedule for each of these Products, then the Licensee shall have the exclusive right to renew this Agreement for another 9 months period at the end of the Initial Term ("The Second Term"). The Licensee shall notify the Licensor not less than 20 working days before the expiry of the Initial Term of its desire to renew the Agreement in accordance with this provision*

*1d If during the "Second Term" the Licensee shall have purchased not less than 65 PPNG and 40 PP Personal Products from the Licensor and paid the price set out in the Schedule for each of these Products then the Licensee shall have the exclusive right to renew this Agreement for another 9 months period ("Third term") at the end of the Second Term*

PAUL ... HEKMAN SWORN TRANSLATOR





*If during the "Third Term" the Licensee purchases not less than 150 PPNG and 75 PP Personal Products from the Licensor and paid the price set out in the Schedule for each of these Products then the license will be renewed automatically, unless terminated by either party with the express condition of giving to the other not less than 20 working days notice of its intention to terminate this agreement before the expiry of any Term (...)*

Hereinafter, the licensee agreements of 20 September 2004 and 1 June 2005 will also be referred to as: the "Agreement of 20 September 2004" and the "Agreement of 1 June 2005", respectively. They will jointly also be referred to as: the "Agreements".

2.10 In an email from M van der Meer (PPI) to Giezen and Van Aspert dated 28 July 2005 it is stated:

*(...) Can you please give me list of all countries that have to be included in the country option of ME com? (...)*

By email of 28 July 2005, Van Aspert responded to this email from M van der Meer as follows:

*(...) Please include the following countries, in alphabetical order:*

*Bahrain, Egypt, Islamic Republic of Iran, Iraq, Jordan Kingdom of Saudi Arabia, Kuwait, Lebanon, Oman, Palestine, Pakistan, Qatar, Syria, United Arab Emirates, Yemen*

*Other countries like Libya, Sudan, Somalia or whatever*
*India and surroundings (Bangladesh, Brunei, Nepal, Sri Lanka etc.), Pakistan, (Afghanistan) should also be stated under South Asian Countries*

*The above-mentioned countries are all Islamic countries and have to be described as above (...)*

By email dated 29 July 2005 M van der Meer wrote to Van Aspert:
*(...) Thanks for the list. If you agree with the offer, please send me a confirmation of this email and of the attachment so that I can give the Website builder the go-ahead (...)*

2.11 In the beginning of 2006 Guus van der Meer sold his shares in PPI to an American hedge fund, which resulted in changes in the composition of the board and to the appointment of other directors, including M Minter as president.

2.12 In an email from this Minter to E Gannage, a former sub-distributor of HMET in the Lebanon, dated 19 April 2006, it is stated:
*(...) PPME is licensed to distribute our product in several ME territories, including the Lebanon, and is subject to blanket volume requirements for the combined territories in order to maintain the license To effect distribution they are free to the extent they are able to establish their own infrastructure and presence in any of these territories to appoint agents*





*or, as they have done, to sub-licence these rights as they have to you. We have neither desire, nor grounds, at this point, for termination of their license (...)*

2.13 By email dated 19 June 2006 M Minter wrote to Giezen:
*(...) As for the contract, as mentioned when we met, due to the restructuring, the PPI BV company in the Netherlands will be liquidated within the next few weeks to make way for our new corporate structure The new Dutch entity will not own the IP and will not be legally allowed to sell product outside NL In order to comply with our insurance and tax requirements we cannot sell products for resale without there being a contract between the parties (...)*

*We are delighted at your continually improving sales We do not want any interruptions. Therefore I would urge you to contact me to discuss anything you wish about the new contract, but there WILL be a point soon, when we cannot supply product other than under the terms of this new agreement (..)*

2 14 M Minter informed Giezen in an email dated 15 July 2006:
*(...) Reason for our request derives from our being in the process of liquidating PPI BV. We own 100% of this company and Arun and I have total control of the bank accounts It would simpli5 our inter-company accounting somewhat if you could make this payment, provide the supporting documentation, and get our immediate refund*

*Would ask you, in the spirit of our co-operation, to reconsider your position (...)*

2.15 On 9 September 2006 M Minter informed Giezen as follows:
*(...) As mentioned, we will seek advice of UAE counsel as to the enforceability of the contract drafted by us Where necessary we will make any modifications to preserve its original intent*

*Meanwhile we will direct all correspondence to our lawyer who will correspond only with your legal representative. Our lawyer is in a position to fully explain to yours the logic and intent of our drafting*

*There will be a point when you will need to consider the merits of doing business with us on terms which we consider to be reasonable or not ()*

2.16 A subsequent email from Giezen to Minter dated 10 September 2006 stated:

*(...) However I'm considerable shocked about the content of it Of course I understand that our lawyers need to work on an acceptable agreement but it needs to be mutual acceptable By mentioning that we have to consider doing business with you (PPI) based only on terms you (PPI) consider as reasonable can't be the case*

*You (PPI) have purposed a new contract which doesn't mean that we have to agree and to accept al less secure contract as the present contract which is a value contract which will remain until we have agreed to the new contract and this is signed We are entitled to defence*





*our company for again a secure contract for now and in the future since Power- Plate Middle East is a company own by us ( ..)*

2.17 In an email from Giezen to Minter dated 30 September 2006 it is laid down:
*( .) Even keep in mind that someone can easily start tomorrow a machine called Power-Plate Newest Generation in the Middle East and start selling it based on what we have created ( .)*

2.18 By letter dated 19 October 2006 PPI terminated the Agreements with HMET. It is stated in these letters:
*(...) On behalf of our client we herewith terminate said agreement pursuant to article (1) thereof by summary notice with immediate effect, because of various breaches of the agreement by your enterprise which are incapable of being remedied*

*The breaches include but are not limited to sublicensing in violation of article 1(a), modification of the product in violation of articles 3(b) and 8(a), threatening to build your own vibration machine in violation of article 8(b) Furthermore, you have acted contrary to your duties as a good distributor (...)*

2.19 In a written statement from M Minter (PPI) dated 18 December 2006 it is stated:
*( .) **Improper sub-licensees** (... ) I explicitly point out that we have never consented to the appointment of third parties on the basis that these third parties would carry out activities at their own expense and risk ()We knew that HMEI served the market in those countries through representatives (agents, sub-distributors, dealers, sub-licensees or whatever these representatives should he legally characterized), be it that those representatives should at all times conduct the Power Plate business in the respective countries at the expense and risk of our contracting party HMET. That the Power Plate business had to be conducted at the expense and risk of HMET was something both PPI and HMEI were fully aware of (. .)*

***HMET's product tampering, defacement and mispresentation of product country of origin*** *(...) I understand that this conduct was part of a scheme by HMET to defraud its customers into believing that the products were manufactured in Europe rather than in China, thereby exposing PPI to direct liability from the defrauded customers, as well as from HMET's representatives,*

***HMET's misrepresentation of its sales territory*** *(. .) As a result, PPI is now exposed to substantial liability for these misrepresentations (. )*

***HMET's threat to manufacture and sell competing products*** *(. .) Mr Giezen and Ms Van Aspert threatened to manufacture vibration equipment themselves in order to compete again PPI The explicit threat to manufacture occurred in a telephone conversation of October 10, 2006 where I was advising them that they were not free to negotiate sales to global customers ( .) In response they stated that they had the ability to create similar products themselves, and that they would do so and then sell such products to these unapproved global customers if I did not agree to let them sell the PPI products ( ..)*

PAULUS HEKMAN SWORN TRANSLATOR





## 3. The dispute

3 1 HMET et al claim - stated briefly - that the *voorzieningenrechter*, by judgment having immediate effect:

I orders PPI, by way of provisional relief, to pay €4,000,000 as an advance payment for compensation of the loss HMET et al. have suffered and will still suffer, or such sum as the *voorzieningenrechter* shall decide in all fairness;

II (...)

III orders PPI to pay the costs of these proceedings

3 2 HMET et al. base their claim - stated briefly - on the ground that PPI, as will be further set forth below, had no valid reason to summarily terminate the Agreements on 19 October 2006. The Agreements are terminated wrongly and HMET et al. suffer considerable loss as a result of that termination

## 4. The Assessment

4.1 PPI based its termination of the Agreements on the following grounds:

- HMET granted sub-licenses in violation of articles 1(a) and 1(f) of the Agreements;
- HMET has made modifications to the Power Plates in violation of articles 3(b) and 8(a) of the Agreements;
- HMET has threatened to build a competing machine, in violation of article 8(b) of the Agreements;
- HMET has acted in violation of its obligations as a good distributor.

4 2 Below, each of the above-mentioned grounds will be discussed separately

*Granting sub-licenses by HMET to third parties*

4.3 PPI contends that HMET was not allowed, pursuant to articles 1 (a) and 1 (f) of the Agreements, to assign the rights to sell the Power Plates it was awarded to third parties without the prior written permission of PPI

4.4 HMET et al responded to this by stating that an email from T van Deijssel, of PPI, to HMET dated 31May 2005 (see above, under 2.8) and an email from M Minter, President of PPI, to E Gannage, former sub-distributor of HMET in the Lebanon, dated 19 April 2006 (see above under 2.12), show that PPI had been aware that HMET had appointed agents and sub-distributors in its territory for the sale of Power Plates for quite some time and that PPI allowed this.

4.5 PPI responded to this by stating that the statement of HMET et al. that PPI supposedly had given it permission to appoint sub-distributors is incorrect. The said emails misrepresent the events, since they have been taken entirely from their context. In addition PPI argued that it never gave permission to appoint sub-distributors with the understanding that these third parties would sell the Power Plates for their own account and

PAULUS A. HEKMAN * SWORN TRANSLATOR *





risk. The only way in which PPI is able to control the resale of the Power Plates in its distribution network is by having the local activities conducted for the account and risk of its contract parties. If HMET (or one of its agents) infringe the intellectual property rights of PPI, PPI should be able to hold HMET directly liable The same holds true, or so PPI contends, for (inter alia) guarantees and complaints, insofar as they fall within the distributor's scope of risk PPI referred in this regard to the statement of M Minter dated 18 December 2006 it submitted

4.6 De *voorzieningenrechter* considers first of all that PPI cannot limit itself to a refutation as set forth in 4.5 PPI was to have given the proper context (in its view) by way of submitting the correspondence and/or meeting reports that constitute the context of the disputed emails.
The *voorzieningenrechter* considers it likely that PPI did not only allow that sub-distributors, were appointed, but that this even took place with its consent. This is even more plausible because by doing so the scope of action of HMET - and consequently the possibility for setting up a network, which was also for the benefit of PPI, and for generating sales - was expanded.
Nor is the appointment of sub-distributors incompatible with the principal's wish to be able to hold the distributor to account and liable with respect to the mentioned issues Such issues are commonly contractually agreed between the parties in a distribution network.
Finally, no evidence has been submitted that the sub-distribution agreements used by HMET have resulted in any problems that have been or may be imputed to HMET.
This means that the first ground for termination is invalid.

*Unauthorised modifications by HMET to the Power Plates*

4.7 PPI contends that HMET modified the Power Plates without being authorised to do so by removing Chinese characters on the Power Plates without its permission and by doing so acted in violation of articles 3(b) and 8(a) of the Agreements. PPI believes that this alone already constitutes sufficient grounds to be allowed to summarily terminate the Agreements.

4.8 HMET et al. contend that HMET made the said modifications in March/April 2005 with the consent, or in any event with the knowledge, of PPI, to some ten Power Plates and that as from July 2005 the Power Plates no longer contained any Chinese characters. HMET et al. also pointed out the fact that the "Certificate of Origin" they have submitted, stated:
*"We, Power-Plate International herewith confirm that the goods shipped on the "CMA CGM Othello" with Bill of loading number "1RT0I3946" originate from The Netherlands"*

4.9 PPI contests that spraying out the Chinese characters on the Power Plates only took place in March/April 2005; it submitted in this connection that the Power Plate was produced in China for the entire duration of the Agreements. According to PPI, the Certificate of Origin only pertains to the country from where the goods were shipped and has no bearing on the country in which the Power Plates were (and are) produced, i.e. China. Furthermore, PPI contests that the spraying over only happened occasionally.

PAULUS A. HEKMAN SWORN TRANSLATOR





4.10 The *voorzieningenrechter* considers that HMET et al. have made a sufficiently plausible case that the modifications to the Power Plates were made with the (tacit) consent and knowledge of Ch. De Groot, assistant operations manager at PPI. The *voorzieningenrechter* refers in this connection to an email from Giezen to De Groot dated 29 March 2005 (see above, under 2.7). Since De Groot was one of HMET's permanent contacts at PPI, said knowledge of De Groot must also be attributed to PPI. This is not altered by PPI's contention that Van der Meer (director of PPI) did not consent to the request HMET made to him to have the Chinese markings removed, since this request was made before the said email of 29 March 2005 was sent.

4.11 Furthermore, it is not considered likely that PPI tried to market the products as being made in China. The *voorzieningenrechter* deems it likely that generally speaking the idea exists that products made in Western Europe are more highly valued in the Middle East than products made in China PPI has failed to make a plausible case that it is of a different opinion in this regard Nor has PPI further substantiated that is has an interest in having China stated as country of production

4.12 Finally, PPI failed to make a plausible case that the said modifications were made more than just occasionally. The email from Giezen to M Minter, submitted on the part of PPI as exhibit 9, in which Giezen writes "*We used paint spray to take this away allways*" insufficiently substantiates this, since the number of times such modifications were made is not further specified.

4.13 But even if the above were otherwise, the "modifications" could still not be used as ground for termination, in a situation in which there is no evidence that PPI has demanded beforehand that the spraying over be ceased henceforth.

4.14 PPI's contention, as laid down in the statement of M Minter dated 18 December 2006 (quoted above, in 2.19), to the effect that PPI ran the risk of being held liable due to the unauthorised modifications, must be ignored under the circumstances as set forth above, since PPI has failed to further substantiate this.
PPI also failed to make a plausible case that PPI has suffered any (other) loss as a result of the modifications.

*Threat to build a competing machine*

4.15 PPI contends that HMET et al. acted in violation of the Agreements by threatening to build a competing machine (or have it built). This circumstance was one of the reasons for PPI to terminate the Agreement, or so PPI contends

4.16 This contention is based on Giezen's email to Minter dated 30 September 2006 (see above, under 2.17). PPI furthermore referred to M Minter's statement of 18 December 2006 (see under 2.19) to the effect that during a telephone conversation on 10 October 2006 Giezen and Van Aspert made threats to the same effect.
During the hearing HMET et al. explained that the email was only intended to warn PPI that it would be very easy for an infringing party to build a similar machine and they denied that

PAULUS A. HEKMAN
SWORN TRANSLATOR





they threatened at any time to build a competing machine They assert that they would not even know how to do this.

4.17 The *voorzieningenrechter* considers that, in view of the denial, it has not been made sufficiently plausible that the alleged threat was made. The quoted email may very well be interpreted in the manner that HMET et al. have contended and the telephone conversation referred to by Minter took place at a time when PPI was already in the process of terminating the relationship with HMET, which means that, even assuming that this conversation is correctly represented, it should be viewed in this context.
Whatever may be the case, what again applies is that the ground submitted by PPI does not justify summary termination. PPI must at least have been expected to have given HMET the opportunity to cease any violation of the Agreements.

*Unauthorised expansion of territory*

4.18 PPI contends that HMET et al. marketed the Power Plate outside the contractually allocated territory without being authorised to do so PPI holds that this may be inferred, among other things, from HMET's website www.hollandenterprisegroup.com, and from its renewed website (www.powerplate.com) According to PPI, HMET et al. have not submitted a shred of evidence for their assertion that PPI had been aware of the information that had been published on the website www.hollandenterprisegroup.com (to which visitors of www.powerplateme.com are automatically linked, according to HMET et al.) since 2004.

4.19 In substantiation of their assertion that PPI agreed that, in deviation from the Agreements, HMET would not only distribute the Power Plate in the Middle East but in all Islamic countries, HMET et al referred to the emails from M van der Meer, Van der Meer's right hand man, to Giezen and Van Aspert on 28 July 2005 and 29 July 2005, and to Van Aspert's response to that email (see above, under 2.10), regarding the countries to be included in the list of countries for ME.com HMET et al furthermore referred to the emails from PPI to HMET (exhibit 8 to the summons) dated 16 January 2006, 24 August 2006, and 25 September 2006, which show that PPI forwarded 'leads' from countries other than those that were allocated to HMET in the Agreements to HMET, with the request to follow up those leads.

4 20 PPI denied that it had given the said consent PPI has concluded exclusive distribution agreement all over the world, including in those countries of which HMET et al. wrongly contend that they came to form part of their distribution territory. Moreover, the number of Islamic countries is much larger than the countries HMET et al. mention on their own website. The fact that PPI is now being held liable as a result of unauthorised border crossing by HMET is confirmed by the statement from M Minter. PPI denies that it continually forwarded leads to HMET for orders from countries outside the territory contractually allocated to HMET PPI holds that this happened only occasionally, and solely in order to fill a vacuum that was created because of the expiration of an agreement with another exclusive distributor. HMET was in reason not allowed to infer a long-term and exclusive right of distribution from the occasional leads, let alone an exclusive right of





distribution for all Islamic countries. For HMET knew that for each country an (exclusive) distribution agreement was required

4.21 The *voorzieningenrechter* considers first of all that it has neither been asserted, nor has evidence been submitted, that PPI, after it had taken note of the information published on the said websites, held HMET to account on the conduct it now imputes to HMET Insofar as PPI contends that the unauthorised crossing of borders is confirmed by the agreements that HMET apparently concluded with its agents, PPI has failed to submit these agreements to the proceedings, whereas it should have been possible for it to have done so, if it was seriously worried about the unauthorised expansion of HMET's territory. Because if that were the case PPI would have asked HMET to submit these agreements to it long ago. All this in itself already suggests that this "violation" of the Agreement was not as serious as it is made out to be either

4.22 It does not have to be discussed further whether formal permission was given for the expansion of the territory that was allocated by the Agreements to HMET Given the inclusion on the above-mentioned website and the manner in which the 'leads' were dealt with, the *voorzieningenrechter* deems it at least likely that it had become common practice between the parties, in 2004 and 2005, that the contractual limits of the territory that was allocated to HMET were not strictly observed. Understandably so, in an organisation in which PPI was still in the start-up phase and in which not all countries were (apparently) yet (adequately) covered by exclusive distribution agreements. It is noteworthy in this regard that PPI makes no mention of any distributors actually complaining that HMET was distributing Power Plates within the territory that was contractually allocated to these other distributors; it must therefore be assumed that such complaints were never made. Although it is possible that the continuing development of PPI's network might have resulted in this matter being considered differently at PPI in mid-2006 from how it was in 2005, this still would not constitute a ground for termination the Agreements without first having discussed this new policy with HMET, or without first having demanded that the Agreement would henceforth strictly be complied with, and stating concretely how this should be put into practice

*Fictitious grounds for termination?*

4.23 HMET et al. argue that PPI never warned HMET about the improper conduct that is imputed to it and that PPI never demanded of HMET that it cease this conduct. If the imputed conduct was indeed such a bone of contention for PPI, it would have been logical for PPI to demand of HMET that it cease this conduct For this reason it must be assumed that PPI trumped up the grounds given for summarily terminating the Agreements.

4 24 The *voorzieningenrechter* deems this a plausible argument. The imputations of PPI, as discussed above, partially bear on conduct of HMET that had been going on for quite some time when PPI terminated the Agreements, in October 2006, and of which PPI was aware. If PPI regarded this conduct (rightly or wrongly) as a violation of the Agreements (as a result of which it suffered harm), this should have been expressed somehow in correspondence, meeting reports or other documentary evidence

PAULUS A. HEKMAN SWORN TRANSLATOR





The fact that PPI has not submitted any emails, letters, minutes or comparable documents in substantiation of its argument, is therefore in itself already sufficient reason to assume that the real ground for terminating the Agreements is not to be found in the issues that are discussed above. It must be assumed that the real ground for termination, as HMET et al. argue, is to be found in the fact that HMET refused to conform to the wishes of the new management, which in turn was none too pleased with a distributor which asserted its rights. The emails quoted above in 2.13 - 2.16 speak volumes in this regard.

*Conclusion: wrongful termination*

The arguments put forward by PPI cannot hide the fact that the Agreements were terminated wilfully and intentionally while bypassing all contractual rules that apply between the parties, simply because PPI wanted to get rid of HMET for commercial reasons.

*The extent of the loss*

4.25 HMET et al. contend that, by virtue of the renewal clause it contained, the Agreement of 20 September 2004 could have been renewed twice with a period of 12 months, provided that HMET achieved the agreed targets, which had always been the case. Only after the third term had expired (1 October 2007) could either party terminate the Agreement, subject to a term of notice of 20 days. Before that date it was not allowed to terminate the Agreement The Agreement of 1 June 2005 includes a similar clause. The earliest date as per which this Agreement could be terminated was 1 December 2007, also subject to a notice period of 20 days.

4.26 PPI has not denied the interpretation of the renewal clause as set forth above. It did submit, however, with a reference to article 1c of the Agreement, that HMET had failed to comply with its payment obligations and consequently with the requirements for renewal of the Agreement. It submitted in this connection that HMET failed to pay all of its invoices (or to do so in time) and that it was forced to remind HMET of this fact by email dated 10 March 2005 (see 2.6)
Since HMET had failed to comply with its payment obligation with due observance of the applicable conditions, the Agreement had lapsed after the "Initial Term" had expired, or as per 1 October 2005. Since all parties continued to do business as usual, an agreement for an indefinite period of time was created. PPI was allowed to terminate the Agreement unconditionally, with due observance of a reasonable notice period, which, under the circumstances and given the duration of the Agreement, would have to be not more than two months. According to PPI this means that, if it is held to be liable to pay compensation, it may only be held liable for loss of net profit suffered by HEMT for a maximum period of two months

The *voorzieningenrechter* considers in this regard as follows.

4.27 Given their age and the amounts, the invoices to which the email of 10 March 2005 refers were, in the opinion of the *voorzieningenrechter*, evidently overlooked by both parties. Given that the relationship between PPI and HMET was continued, a reasonable

MARIUS A. HEKMAN SWORN TRANSLATOR





interpretation and application of the Agreement of 20 September 2004 means that the Agreement was renewed with a period of 12 months as per 1 October 2005 and that HMET was again entitled to claim renewal of the Agreement with another period of twelve months, as per 1 October 2006. This means that the earliest date as per which the Agreement of 20 September 2004 could be terminated was 1 October 2007 The earliest possible date as per which the Agreement of 1 June 2005 could be terminated was 1December 2007. This will have to be taken as starting point when determining the extent of the loss

4 28 The *voorzieningenrechter* believes for now that a sufficiently plausible case has been made that HMET et al have suffered considerable loss. An exact estimate of the extent of the loss falls outside the scope of these summary proceedings. It may suffice to state that the accountant's report of AGN MAK of 9 December 2006, HMET et al. submitted as exhibit 14, shows that in the period 1 October 2005 - 1 October 2006 HMET made a net profit of (converted) US$950,000. On the basis of the statements in the covering letter to the accountant's report - which according to PPI signify that the figures were not obtained on the basis of an audit of any annual accounts and that the figures submitted by HMET are based on an unsound administration - PPI remarked that the figures mentioned in the report are unreliable. HMET et al. contested this by stating that these statements must be understood in view of the circumstance that the local accounting standards, with which the administration complies, are not in all respects in accordance with international requirements, against which the accountant must check his findings in order to be able to issue an opinion. Since PPI has not contested this refutation of HMET et al. the report is considered sound enough for the time being to assume, taking into account the pattern of increasing profits since 2005, that in the event of a continuation of the Agreement a net profit of at least US$ 100,000 per month would have been made in 2007. It may be agreed with PPI that a number of expenses are no longer made, which would have to be subtracted from this amount, but this is negligible compared with the likelihood that, assuming the circumstance that the profit in 2006 was four times the profit of 2005, the actual loss of profit is many times larger.

4.29 Parties discussed the question to what extent a debt, if any, HMET owes to Power Plate Ltd (hereinafter: "Ltd"), a company affiliated with PPI, influences the claim for compensation. The circumstance that loss of turnover may also be suffered because it is no longer possible to sell the products supplied by Ltd. must naturally be accounted for when determining the loss as well. It does not matter, in that regard, whether or not these purchases were construed in such a manner that PPI may set off a claim Ltd. has on HMET with PPI's debt to HMET due to wrongful termination.

4.30 HMET et al. asserted that Giezen and Van Aspert spent US$300,000 on marketing last year and that they ran a Power Plate Center in Dubai, which was recently refurbished for US$50,000 and which includes for US$100,000 in equipment
These investments are lost, since Giezen and Van Aspert are no longer allowed to act for PPI in the Middle East. HMET et al offered PPI the opportunity to limit the loss HMET is suffering by having it take over the Power Plate Center from HEMT, but according to HMET et al PPI stated that it was not prepared to do so
The *voorzieningenrechter* considers that, since PPI has not contested these arguments of HMET et al., they must be assumed to be correct for now.

PAULUS A. HEKMAN * SWORN TRANSLATOR *



*Set-off?*

4.31 PPI argued that against the claim made by HMET, it has a claim on HMET, due to unpaid invoices, of US$291,974.79, which means that - even if it is decided that HMET has a claim - the claims of the parties must be set off.

4.32 PPI did not persist in its alleged claim on HMET after it was contested by HMET supported with reasons. HMET acknowledged that it owes a debt to PPI UK Ltd. of US$95,150, but, as HMET et al. rightly contended, PPI is not allowed to invoke set off in this regard, since the requirement that the parties must be each other's debtor has not been satisfied.

*The allowability of the claim in summary proceedings*

4.33 The claimed relief is for payment of a sum of money. Such claim may only be awarded in summary proceedings if the existence and the amount of the claim are made sufficiently plausible, whereas immediate relief is required due to immediate urgency and provided that the risk that the sum is not repaid - when duly weighing the interests of both parties - does not preclude awarding the claim.

*Urgent interest*

4.34 PPI adopts the view that HMET et al. do not have an urgent interest in awarding the relief they claim

4.35 The *voorzieningenrechter* considers that PPI has not refuted that Giezen and Van Aspert depended for their livelihood and that of their children on the income they generated through HMET. Nor has PPI contested that as a result of the termination of the Agreements they presently do not have any income and that due to the termination of the Agreements they are no longer able to carry out any activities for PPI in the Middle East, so that they are forced to build up an existence elsewhere, for which purpose they require the necessary financial means. Nor did PPI put forward any defence against the argument of HMET et al. that PPI has stated that its activities will be transferred to the United Kingdom and that PPI will be liquidated. All of the above sufficiently demonstrates the urgent interest that HMET et al. have in the requested relief.

*Firmness of the claim*

4.36. It may be inferred from the above that a sufficiently plausible case has been made for the existence and amount of the claim The possibility that a court deciding on the merits of the case will decide that PPI had sufficient grounds for not complying with its obligations under the Agreements until 1 October 2007 and 1 December 2007, respectively, does not have to be seriously taken into account within the context of the weighing of interests prescribed by the said criteria. The grounds for termination put forward by PPI and the story it submitted in support appear to be highly construed

PAULUS A. HEKMAN SWORN TRANSLATOR





*Interest of HMET versus risk of no refunding*

4 37 PPI argues that there is a considerable risk that any amount that is awarded now will not be refunded in the event that a decision is taken against HMET et al. in proceedings on the merits PPI pointed out in this regard what HMET et al themselves have stated, namely that they depend for their livelihood on income they generated through HMET and that they have nothing to fall back on and are forced to build up a new existence elsewhere (in the world). This makes it certain, according to PPI, that HMET et al. will no longer be able to refund to PPI any amount they are awarded (within the context of these summary proceedings) in the event of a possibly contradictory decision of the court deciding on the merits of the case.

4 38 The circumstance that what is concerned in this case is a wilful and intentional pushing aside of a troublesome distributor, in violation of the applicable agreements, apparently because it obstructed the desire for expansion of PPI new-style, means that when awarding the requested relief the interests of HMET et al. must prevail to such extent that a provision must be made that will allow Giezen and Van Aspert to deal with the situation that has arisen as a result of the wrongful termination

4 39 PPI will be ordered to pay HMET et al., all by way of an advance payment, a sum of EUR 500,000 as per 1 February 2007, as well as twenty monthly instalments of EUR 20,000 each (i.e. to a total amount of EUR 400,000)
This relief is deemed sufficient to allow Giezen and Van Aspert to relocate to the Netherlands with their family, to re-establish themselves there and to allow HTEM to continue to pursue its claims against PPI.

4 40 As party against whom the matter is mainly decided PPI will be ordered to pay the costs of these proceedings. The costs on the part of HTEM et al. are estimated at

| | | |
|---|---|---|
| - summons | EUR | 71.32 |
| - court fees | | 4,915.00 |
| - attorney of record's fee | | 816.00 |
| Total | EUR | 5,802.32 |

**5. The claim in the motion**

5.1 Stated briefly, PPI claims that the *voorzieningenrechter*, by judgment in the motion having immediate effect, will order HMET et al. - who according to the summons are established in Dubai, in the United Arab Emirates - must provide security for an amount of EUR 10,539, this being the costs of the proceedings which they may be ordered to pay in the summary proceedings, such costs to be determined by the court.

5.2 The *voorzieningenrechter* considers that since according to what is considered above PPI will be ordered to pay the costs of the proceedings in the main action, it lacks any





interest in having the motion for providing security awarded. The motion will therefore be rejected.

5 3 HMET et al. are deemed not to have incurred any costs in the motion other than those which have already been decided on in the main action

**6. The Decision**

The *voorzieningenrechter*

in the main action

6.1 Orders PPI to pay a lump-sum to HMET et al. of EUR 500,000, by 1 February 2007 at the latest,

6.2 Orders PPI to pay to HMET et al. a sum of EUR 400,000, to be paid in twenty monthly instalments of EUR 20,000 each, for the first time on 1 March 2007 and subsequently on the first day of each month,

6 3 Orders PPI to pay the costs of the proceedings, estimated on the part of HMET et al. until this date at EUR 5,802.32,

6 4 Declares that this judgment to this extent has immediately effect,

6.5 Refuses what is otherwise claimed,

in the motion

6.6 Rejects the claim,

6.7 Orders PPI to pay the costs of the proceedings, estimated on the part of HTEM et al. until this date at nil

This judgment was rendered by judge A.H Schotman and pronounced in open session on 17 January 2007

ISSUED AS PROCESS SERVER'S COPY
To Mr Middeldorp






I, Paulus Antonius Hekman, sworn translator for the English Language, listed in the register of sworn translators of the District Court in Amsterdam, The Netherlands, do solemnly and sincerely declare that the above is a full, true and faithful translation made by me of the document annexed hereunto, which was submitted to me in copy for translation, in testimony whereof I have hereunto set my hand on this day, the twelfth of April two thousand zeven

